# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RONALD R. PETERSON, *as Chapter 7 Trustee* | ) | |
| *for Lancelot Investors Fund, L.P., et al.,* | ) | District Court No. _____ |
| | ) | Judge _____ |
| Plaintiff, | ) | Adv. No. 11-00486 |
| | ) | Chapter 7 |
| v. | ) | |
| | ) | |
| WINSTON & STRAWN LLP, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## MOTION OF DEFENDANT WINSTON & STRAWN LLP
## TO WITHDRAW THE REFERENCE

Plaintiff Ronald R. Peterson (the "**Trustee**") stands in the shoes of four hedge funds (collectively, "**Lancelot**" or the "**Funds**") that perpetuated one fraud and were victimized by another. Lancelot lent over $1 billion to a Ponzi scheme operated by the now-incarcerated Tom Petters ("**Petters**"). While Lancelot was initially unaware of Petters' Ponzi scheme, it later (according to the Trustee) "joined" the scheme by concocting a series of "round trip" transactions designed to make Lancelot appear solvent. By the time the FBI discovered the Petters/Lancelot schemes in 2008,[1] most of Lancelot's assets had been dissipated. Lancelot sought relief under chapter 7 of the Bankruptcy Code, and the Trustee was appointed to administer Lancelot's estates.

The Trustee stands in the shoes of an admitted fraudster and initially focused its attention on the actors responsible—those who ran Lancelot. Then, the Trustee began trying to blame outsiders for the estates' travails. The Trustee has sued, among others, Lancelot's auditors, but

---

[1] Petters was found guilty of twenty counts of fraud, conspiracy, and money laundering, and was sentenced to 50 years in prison. *United States v. Petters*, No. 08-cr-364(1) (D. Minn Apr. 8, 2010). Lancelot's sole manager, Greg Bell ("**Bell**"), later pled guilty to fraud and was sentenced to 6 years in prison. *United States v. Bell*, No. 09-cr-269 (D. Minn Oct. 7, 2009).

that case was dismissed for a simple and straightforward reason: the Trustee stands in the shoes

of the very people that the Trustee concedes were ultimately responsible for the estates' losses.

*Peterson v. McGladrey & Pullen*, No. 10 C 274, — F. Supp. 2d —, 2010 WL 4435543 (N.D. Ill.

Nov. 3, 2010). Now the Trustee has set it sights on Winston & Strawn LLP ("**Winston**"), a law

firm that drafted private placement memoranda issued by Lancelot to prospective investors. The

Trustee concedes that Winston did not participate in, or even have knowledge of, *either* fraud.

Nevertheless, the Trustee asserts that Winston breached fiduciary duties to, and is liable to, an

estate that is responsible for the very fraud for which it seeks to recover against Winston.

    The Trustee's adversary complaint defies settled law on numerous grounds. Winston will

seek dismissal. But as an initial matter, Winston seeks withdrawal of the reference because this

case belongs in the District Court, not the Bankruptcy Court where the Trustee filed it.

    Withdrawal of the reference is appropriate for "cause." 28 U.S.C. § 157(d). "Cause"

"automatically exists" when the action is "non-core" and the movant has a right to a jury trial.

*Peachtree Lane Assocs. Ltd. v. Granader*, 175 B.R. 232, 235 (N.D. Ill. 1994). Here, the Trustee

concedes that the "adversary proceeding is not a core proceeding." Ex. A, Complaint at ¶ 18,

*Peterson v. Winston & Strawn LLP*, No. 11-00486 (Bankr. N.D. Ill. Feb. 22, 2011) (hereafter

"Compl."). Winston demands a jury trial and does not consent to trial in the Bankruptcy Court.

Accordingly, "cause" exists to withdraw the reference.

    Moreover, even if withdrawal were not virtually "automatic" (which it should be),

prudential concerns further support the requested relief. The Trustee has raised similar claims

against Lancelot's auditors, and when it did so, the reference was withdrawn and the case was

dismissed under the doctrine of *in pari delicto*, which provides that "a plaintiff who has

participated in wrongdoing may not recover damages resulting from his wrongdoing," *Peterson*,

2010 WL 4435543, at *3 (quoting *King v. First Capital Fin. Servs. Corp.*, 828 N.E. 2d 1155,

1173 (Ill. 2005)).  Here, the Trustee complains of Winston's alleged failure to investigate,

discover, and disclose a fraud in which the Trustee affirmatively alleges the Funds participated

by, among other things, engaging in "round trip" transactions and other fraudulent attempts to

conceal the fact that Petters was not repaying the Funds' loans on time.  In essence, the Trustee is

complaining that Winston should have discovered and disclosed to the Funds the fact that they

were engaged in a fraud against prospective investors.  It is hard to imagine a clearer case for

application of *in pari delicto*—indeed, this case is a far more compelling case for immediate

dismissal than the *McGladrey* matter that Judge Bucklo has already dismissed.

Where, as here, the Bankruptcy Court cannot issue final orders on any issues without

obtaining *de novo* review by a District Court, nor could it conduct the jury trial that at least one

party (Winston) demands, and the District Court is already familiar with some of the key

underlying issues, it would waste the Bankruptcy Court's resources to entertain this case at all.

Thus, Winston respectfully requests that the Court withdraw the reference of this adversary

proceeding.

**FACTUAL BACKGROUND**

**I.      The Petters Ponzi Scheme**

Between 2002 and 2008, the Lancelot funds invested primarily in purchase-order finance

notes issued by an entity controlled by Petters, purportedly to fund that entity's acquisition of

consumer electronics for resale to major retailers.  Ex. A, Compl. ¶ 20.  In theory, the loans from

Lancelot were secured by Petters' accounts receivable and by the electronics themselves.  *Id.*  In

reality, however, there were no actual purchase orders or any actual consumer electronic goods;

rather "the loans from [Lancelot] were financing a massive Ponzi scheme which resulted in the

loss of billions of dollars."  Compl. ¶ 21.  The Petters Ponzi scheme was uncovered in September

2008 by a federal task force that took invoices provided by Petters to the electronics retailers,

who confirmed that they were "completely bogus." Compl. ¶ 23.

## II.    Lancelot's "Second Level Ponzi Scheme"

Lancelot was owned and controlled by Gregory Bell. Compl. ¶ 3. According to the

Trustee, Lancelot was not initially aware of the Petters Ponzi scheme. However, in 2008, Petters

stopped repaying the loans to Lancelot. According to the Trustee, Lancelot and Petters then

concocted a series of "round trip" transactions to hide the problem. In the Trustee's words:

> [W]hen the Petters' Ponzi scheme began to collapse and Petters became unable
> [to] repay the notes it had issued to the funds, Bell had a choice. He could have
> chosen to acknowledge the defaults by Petters, with the consequence that new
> investors would have been scared away from his funds, heavily invested as they
> were in Petters notes that were beginning to default. But instead he chose to hide
> the problem from investors with "round trip" transactions which were used to
> "refresh" the funds receivables, so he could continue to entice new investors into
> the funds. Effectively, when the Petters' Ponzi scheme began to unravel, Bell
> responded by converting his own funds into a second level Ponzi scheme in an
> attempt to keep them afloat.[2]

## III.   The Trustee Pursues The Lancelot Insiders Responsible For The Funds' Demise.

Lancelot sought Chapter 7 protection on October 20, 2008. Ex. A, Compl. ¶ 10. The

Trustee initially focused his attention on the Lancelot management team.

### A.    The Trustee Blames Bell, Who Controlled Lancelot And Had Exclusive Authority To Make Its Investment Decisions.

On December 7, 2009, the Trustee filed an adversary proceeding against Greg Bell and

the various vehicles through which Lancelot was controlled by Bell. *See* Ex. C, Complaint ¶ 2,

*Peterson v. Bell*, No. 08-28225 (Bankr. N.D. Ill. Dec. 7, 2009) (hereafter "Bell Compl."). As the

Trustee alleges in his complaint against Bell, each of the debtors in whose shoes the Trustee

stands "was ultimately controlled by Bell, through various levels of management companies set

---

[2]    Ex. B, Trustee's Motion for Entry of an Order Establishing Omnibus Procedures for Settlement of Avoidance Claims at ¶ 9, *Peterson v. Bell*, No. 08-28225 (Bankr. N.D. Ill. Sept. 7, 2010).

up by Bell." *Id.* ¶ 17.  In addition, each debtor had delegated sole and exclusive authority to make investment decisions to Bell who made the investment, management, and operational decisions for the funds.  *Id.* ¶¶ 51, 55, 57, 60.

The Trustee alleges that, from the inception of Lancelot, Bell was negligent in failing to verify the legitimacy of Petters' businesses and the collateral underlying the loans to Lancelot.  Ex. C, Bell Compl. ¶ 8.  Petters and his affiliates had "created fictitious invoices, purchase orders, and other documents" to deceive Bell, Lancelot, and others.  *Id.* ¶ 40.  Bell did nothing to verify them.  *Id.* ¶¶ 96-100, 130.  Had Bell done so, the Trustee contends that "the Funds could have avoided massive losses by revealing the Ponzi scheme orchestrated by Petters."  *Id.* ¶ 118.

Further, the Trustee alleges that on or about February 28, 2008, Lancelot "joined the Ponzi scheme."  *Id.*¶¶ 9, 101.  Specifically, in an effort to conceal Petters' failure to repay certain notes, Lancelot concocted 67 "round-trip" transactions in which it would send payments to Petters and, within hours, Petters would wire "an almost identical amount of money" back to Lancelot.  *Id.* ¶¶ 102-109.  This effort delayed, but inherently could not prevent, the demise of Lancelot caused by the Petters Ponzi scheme.

**B.     The Trustee Also Blames The Off-Shore Lancelot Funds' Board of Directors, Who The Trustee Claims Also Participated In The Fraud.**

On December 14, 2009, the Trustee filed an adversary proceeding against the members of the board of Lancelot's off-shore funds, who worked for Swiss Financial Services ("SFS").  *See* Ex. D, Complaint, *Peterson v. Swiss Financial Services*, No. 08-28225 (Bankr. N.D. Ill. Dec. 14, 2009) (hereafter "SFS Compl").  The SFS complaint alleges that SFS (through its employees) breached its fiduciary duty to and its administrative contract with the Funds.  Ex. D, SFS Compl. ¶¶ 126-34.

The Trustee's charges against SFS are similar to those against Bell.  The Trustee claims that as members of the Lancelot off-shore board of directors, SFS members "failed to recognize clear indicia of the fraudulent scheme perpetrated by Petters.  Had [SFS] adequately performed their duties and responsibilities, they would have discovered the Petters fraud."  *Id*. at ¶ 90.  Although the offshore board members "enjoyed superior access to information regarding the Funds," they "failed to investigate the value of the collateral underlying the Notes purchased by the Funds and to investigate the existence, operation, and effectiveness of the Funds' safeguards to manage risk."  *Id*. ¶¶ 128, 131.

According to the Trustee, the board members' breaches of fiduciary duty to Lancelot were motivated by greed: SFS's "fees were based on the value of the Funds' assets."  *Id*. ¶ 91.  "In other words, the greater the Net Asset Value of the Funds, the greater the compensation Defendants received."  *Id*.  Accordingly, SFS "had a financial incentive not to impair the value of any Notes owned by the Funds, but instead to ignore the risk that the Funds would not collect all principal and interest owed under the Notes."  *Id*. ¶ 92.

The Trustee contends that SFS's negligence and breach of contract caused Lancelot damages of $1.5B—the amount loaned by Lancelot to Petters that remained unpaid when the Ponzi scheme was discovered.  *See* Ex. D, SFS Compl. ¶ 105.

* * *

In sum, the Trustee has acknowledged that Lancelot's insiders were responsible—through gross negligence, and ultimately, through Bell's own fraud—for Lancelot's defunct investments in Petters' scheme.  However, the Trustee did not let its awareness of the obvious cause of Lancelot's collapse stop it from subsequently suing anyone and everyone who provided any type of professional services to Lancelot on Lancelot's behalf, based on the notion that they

owed some sort of extraordinary (and non-existent) duty to Lancelot to prevent it from both

falling prey to and committing frauds which were unknown to them.

## IV.    The Trustee Blames The Funds' Auditors.

On December 7, 2009, the Trustee filed a lawsuit in the Circuit Court of Cook County

against McGladrey & Pullen LLP, Lancelot's auditors (along with the other defendants,

"**McGladrey**").  *See* Ex. E, Complaint, *Peterson v. McGladrey & Pullen LLP, et al.*, No. 2009 L

014920 (Ill. Cir. Ct. Dec. 7, 2009) (hereafter "McGladrey Compl.").  The Trustee contended that

McGladrey breached its duty of care to Lancelot by "negligently planning and performing the

audits" of Lancelot.  *Id.* ¶ 4.  As a result, Lancelot "continued to invest hundreds of millions of

dollars in an investment vehicle indirectly run" by Petters and "suffered damages in an amount

exceeding $1.5 billion."  *Id.* ¶¶ 5-6.

McGladrey removed the Trustee's complaint to federal court as "related to" the Lancelot

bankruptcy proceeding.  *See* 28 U.S.C. § 1334; *Peterson v. McGladrey & Pullen LLP*, Adv. No.

09-A-01328.  McGladrey filed a motion to withdraw the reference so that the matter would be

heard in the District Court.  That motion was granted.  *Peterson v. McGladrey & Pullen LLP*, 10-

cv-274 (Bucklo, J.)).  McGladrey then filed a motion to dismiss based on, among other things,

the doctrine of *in pari delicto*, which generally provides that "a plaintiff who has participated in

wrongdoing may not recover damages resulting from his wrongdoing," *Peterson*, 2010 WL

4435543, at *3 (citation omitted).  For obvious reasons, including the allegations made by the

Trustee in its complaints against Bell and SFS, McGladrey's motion to dismiss was granted.

As Judge Bucklo explained, "[i]n the Bell case, plaintiff seeks to hold Bell, and the

Funds' management companies, accountable for the wrongdoing that ***directly*** caused the losses

that in this case plaintiff claims McGladrey ***indirectly*** caused through its negligent failure to

uncover the Ponzi scheme.  This is precisely the type of situation in which the Seventh Circuit

has applied *in pari delicto* principles." *Peterson*, 2010 WL 4435543, at *3 (citing *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982)) (emphasis added). Where there is "fraud permeating the top management of [a corporation] . . . the corporation should not be allowed to shift the entire responsibility for the fraud to its [outside professionals]." *Cenco*, 686 F.2d at 456. This is because, under *in pari delicto*, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Peterson*, 2010 WL 4435543, at *3 (citation omitted).

## V.    The Trustee Waits More Than A Year And Then Belatedly Pursues Winston.

On February 22, 2011, more than a year after filing its claims against Bell, SFS, and McGladrey, the Trustee commenced this adversary proceeding against Winston. *See* Ex. A, Compl. The Trustee concedes that Lancelot is insolvent "partly because Management caused the Funds to loan most of the Funds' assets to [Petters who was] operating a Ponzi scheme that unraveled in September 2008." Ex. A, Compl. ¶ 6. While the Trustee claims that "the Funds were also damaged by Winston's breaches of fiduciary duty," *id.*, he does not describe how Winston's alleged breach of fiduciary duty caused any damages to the Funds.

The Trustee's "breach of fiduciary duty" claims against Winston begin with the same charge levied against Bell, SFS, and McGladrey—that Winston failed to investigate (or to tell someone else to investigate) the bona fides of the Petters investments, which the Trustee attributes to an alleged "conflict." *Id.* ¶¶ 7, 25. In Count I, the Trustee alleges that Winston failed to disclose in the Funds' confidential informational memoranda ("CIMs") to potential investors that "the Funds needed to verify—but could not verify—the legitimacy of the 'purchase order financing' plan underlying the Funds' loans to the Petters Entities." *Id.* ¶¶ 7, 27. But as the Trustee acknowledges in his Complaint, the CIMs are not *Winston's* statements to the Funds. Rather, they are the *Funds'* statements to prospective investors. *Id.* ¶ 4 (alleging that the

CIMs were drafted "so the funds could use the CIM's to solicit investors"). The Trustee cannot plausibly blame Winston for allegedly misleading statements in the CIMs; the entities he represents clearly are responsible for, and benefitted substantially from, those statements.

The Trustee's second theory against Winston is even further from the mark. In Count II, the Trustee blames Winston for allegedly permitting Lancelot's off-shore fund to pay too high a management fee to Lancelot's management entity. *Id.* ¶¶ 36-37. The Trustee, of course, does not (and cannot) contend that Winston even advised Lancelot on its management fees or, quite frankly, that it had anything to do with the setting or calculation of this fee. Moreover, the Trustee's theory as to why the fee was too high (that some loans in the Funds' portfolio were "double counted" in calculating the management fee) is demonstrably wrong. Indeed, the documents attached to the Complaint show (and the reality was) that the loans only counted once toward the management fee—not twice as the Complaint suggests. And, perhaps most pertinent here, there is no doubt that the fee was known to the Funds in whose shoes the Trustee stands, as well as those who received the management fee (whose acts are imputed to the Funds).

Finally, in Count III, the Trustee alleges that in the spring of 2008 (approximately six months before the FBI uncovered the Petters and Lancelot frauds), Winston should have initiated an investigation into whether Petters was repaying the Funds on time and discovered Lancelot's "second level Ponzi scheme." In particular, the Trustee alleges that had Winston investigated, it would have discovered before the FBI did that: (1) Petters' loans were in default; (2) "in order to hide that fact, Bell had begun sending *new investor money* to the Petters Entities so that the Petters Entities could (and did) send money back to the Funds to create the appearance of loan repayments"; and (3) "the solicitation of new investor money needed to be stopped." *Id.* ¶ 41 (emphasis added). Once again, the Trustee cannot blame Winston for its failure to uncover the

Funds' *own* fraud, nor can the Funds show any injury from transactions that indisputably

benefitted them by augmenting the Funds' coffers.  In any event, Lancelot's fraudulent

"roundtrip" transactions did not cause the Funds to incur any losses—money that went out the

door to Petters came back to the Funds, which the Trustee's allegations show were actually better

off when they filed bankruptcy than before the "roundtrip" transactions began.  *McGladrey*, 2010

WL 4435543, at *2.

The Trustee sued Winston in the Bankruptcy Court.  This case belongs in, and should be

withdrawn to, the District Court.

## ARGUMENT

United States district courts possess original jurisdiction over all civil proceedings arising

under or related to cases under the Bankruptcy Code.  28 U.S.C. § 1334(b).  All such matters are

referred—as an initial matter—to bankruptcy judges, who have the power and authority to decide

"core" matters arising under or related to bankruptcy cases.  28 U.S.C. § 157.

The initial reference of cases to a bankruptcy court, however, may be "withdrawn"

where, as here, a party to the underlying bankruptcy matter files a motion and demonstrates

"cause."  28 U.S.C. § 157(d).   "Cause" exists here because: (1) this proceeding is a non-core

matter; (2) Winston is constitutionally entitled to and demands a jury trial; and (3) Winston does

not consent to having a jury trial administered by the Bankruptcy Court.  In addition,

considerations of judicial economy also counsel in favor of withdrawing the reference.

## I.    This Court Should Withdraw The Reference Because Winston Has Requested And Is Entitled To A Jury Trial.

"Cause" to withdraw the reference exists if Winston is entitled to a jury trial under the

Seventh Amendment and demands one.  *In re Metro. Plant & Flower, Inc.*, No. 96 C 7804, 1997

WL 638454, at *4 (N.D. Ill. Sept. 30, 1997) ("Cause . . . automatically exists in cases where the

party seeking the withdrawal is entitled to a jury trial under the Seventh Amendment."). A

bankruptcy judge cannot conduct a jury trial unless all parties to the litigation consent. *See In re*

*Grabill Corp.*, 967 F.2d 1152, 1158 (7th Cir. 1992) ("Where a jury trial is required by the

Seventh Amendment, that trial must be held in the district court, sitting in its original jurisdiction

in bankruptcy."); *Novak v. Lorenz (In re Novak)*, 116 B.R. 626, 627 (N.D. Ill. 1990) (granting

motion to withdraw reference based on defendant's jury demand). Moreover, Local Bankruptcy

Rule 9015-1(b) provides that "any bankruptcy judge designated to conduct a jury trial may

conduct such a trial . . . only upon the consent of all parties." *See also* 28 U.S.C. § 157(e)

(same).

Here, Winston is entitled to a jury trial on the Trustee's breach of fiduciary duty claims.

Although claims arising from breaches of fiduciary duties historically sound in equity, where (as

here) the remedy sought is money damages, such claims are "legal" in nature and are covered by

the Seventh Amendment. *See, e.g., CDX Liquidating Trust v. Venrock Assocs.*, Case No.

04C7236, 2005 WL 3953895, *3 (N.D. Ill., Aug. 10, 2005) (where money damages are sought,

defendants to fiduciary duty claims are entitled to jury trial); *Goodman v. Levy*,  No. 06-C-5526,

2007 WL 641562, at *3 (N.D. Ill. Feb. 28, 2007) ("[A]n action for legal malpractice existed at

common law, and it is thus a cause of action for which plaintiff has a right to a jury trial."); *In re*

*Keck*, No. 00 C 1761, 2001 WL 292559, at *2 (N.D. Ill. Mar. 19, 2001) (actions for negligence

and attorney malpractice are actions at common law for which a defendant has a jury trial right).

 Winston does not consent to having the Bankruptcy Court conduct a jury trial. Instead,

Winston invokes its Seventh Amendment right to a jury trial in an Article III court. For this

reason alone, withdrawal of the reference is appropriate. *See K&R Express Sys., Inc. v. LaSalle*

*Bank Nat'l Ass'n (In re K&R Express Sys., Inc.)*, 382 B.R. 443 (N.D. Ill. 2007) (motion to

withdraw the reference granted on account of right to jury trial on breach of fiduciary duty

claims); *The VWE Group, Inc. v. Amlick (In re The VWE Group, Inc.)*, 359 B.R. 441 (S.D.N.Y.

2007) (withdrawing reference of adversary proceeding against debtors' attorneys for malpractice

related to failure to uncover Ponzi scheme); *In re Infotopia, Inc.*, Case No. 05-04026, 2007 WL

2859774 (N.D. Ohio, Sept. 26, 2007) (right to jury trial with respect to fiduciary duty claims was

independent and sufficient "cause" to withdraw the reference of an adversary proceeding); *In re*

*Friedman's Inc.*, No. 407CV041, 2007 WL 1541962 (S.D. Ga., May 23, 2007) (trustee brought

complaint against law firm for, among other things, breach of fiduciary; court granted request to

withdraw the reference given right to a jury trial); *In re Nu Van Tech. Inc.*, No. 01-49589-DML-

11, 2003 WL 23785355 (Bankr. N.D. Tex. Oct. 14, 2003) (same).

## II.     The Non-Core Nature Of The Trustee's Complaint And Other Prudential Considerations Also Favor Withdrawal Of The Reference.

The other key determinant of whether "cause" to withdraw the reference to the

Bankruptcy Court exists is "***whether a proceeding is core or non-core***."  *In re K&R Express*

*Sys.,* 382 B.R. at 446 (emphasis added).  This is because the other factors in assessing "cause,"

such as efficiency, uniformity and judicial economy, turn on the core/non-core distinction.

Although a bankruptcy court can issue final orders in "core" matters, in non-core matters a

bankruptcy court can make only recommendations that would be subject to *de novo* review in a

district court.  *Id.* ("efficiency, uniformity and judicial economy concerns are largely subsumed

within [the core/non-core determination]"); *see also Coe-Truman Tech., Inc. v. United States*

*Gov't (In re Coe-Truman Tech., Inc.)*, 214 B.R. 183, 187 (N.D. Ill. 1997) (non-core status of

proceeding "weighs heavily in favor of withdrawing the reference.  As a non-core proceeding,

the bankruptcy court's decision will be subject to de novo review in this Court.  28 U.S.C. §

157(c)(1). We find, therefore, that it is a more efficient use of judicial resources for this Court to decide this case in the first instance.").

Here, the Complaint confirms that this adversary proceeding is a non-core proceeding. Compl. ¶ 18; *Diamond Mortg. Corp. v. Sugar,* 913 F.2d 1233, 1237 (7th Cir. 1990) (malpractice claims against a debtor's attorneys are non-core); *In re Keck*, 2001 WL 292559, at *3 ("This District has consistently found state law claims that are connected to a bankruptcy case are non-core."). In similar circumstances, where—as here—a defendant in a non-core matter asserts a right to jury trial—courts in this District and elsewhere have routinely withdrawn the reference. *Id.* ("Cause [to withdraw the reference] exists if 'a party in a non-core proceeding stands on its right to trial by jury.'" (quoting *In re Novak*, 116 B.R. at 627)); *In re Metro. Plant & Flower,* 1997 WL 638454, at *4 (in similar circumstances, withdrawal of the reference should be "automatic"); *see also In re Cinematronics, Inc.*, 916 F.2d 1444, 1451 (9th Cir. 1990) (refusal to withdraw the reference was an abuse of discretion given a party's assertion of its right to jury trial); *Veys v. Riske*, No. C07-5625BHS, 2007 WL 4246172, *4 (W.D. Wash. Nov. 28, 2007) ("If the parties fail to consent to a jury trial of noncore issues before a bankruptcy judge and the Seventh Amendment affords a right to trial by jury, withdrawal is appropriate. To fail to withdraw the reference could cause a violation of either the Seventh Amendment or the bankruptcy code.") (citation omitted); *In re Murray*, 149 B.R. 383, 388 (E.D. Va. 1993) (same); *Travelers Ins. Co. v. Goldberg*, 135 B.R. 788, 793 (D. Md. 1992) ("[T]he effect of plaintiffs' jury demand, combined with the non-core nature of this action work to make referral to the Bankruptcy Court a limited and inefficient tool. . . good cause exists to deny the referral."); *Nat'l Enters., Inc. v. Koger P'ship, Ltd. (In re National Enterprises, Inc.)*, 128 B.R. 956, 963 (E.D. Va.

1991) ("withdrawal of the reference to bankruptcy court is the appropriate means of according

Koger its right to a jury trial").

Finally, prudence dictates in favor of withdrawal of the reference now.  This case has just

begun.  The Bankruptcy Court has not taken any action at all relating to it, and any action it did

take would simply be a waste of resources given that it would only be a recommendation that the

District Court would review *de novo*.  Judicial economy and efficiency clearly counsel in favor

of withdrawing the reference now, before either the courts' or the parties' resources are wasted.

## CONCLUSION

For the foregoing reasons, Winston respectfully requests that this Court immediately

withdraw for all purposes the reference of this adversary proceeding to the Bankruptcy Court.[3]


Dated: April 15, 2011                                  Respectfully submitted,


                                                       By:   /s/   Michael B. Slade
                                                       Stephen R. Patton (3121988)
                                                       Michael B. Slade (6274231)
                                                       KIRKLAND & ELLIS LLP
                                                       300 North LaSalle Street
                                                       Chicago, IL  60654
                                                       (312) 862-2000 (telephone)
                                                       (312) 862-2200 (facsimile)

                                                       Attorneys for Winston & Strawn LLP

---

[3]    Winston contacted counsel for the Trustee prior to filing this motion and asked if the Trustee would consent to
the withdrawal of the reference.  As of the filing of that motion, the Trustee's counsel had reported that they
would consider the matter, but had not yet expressed a final view on consent.

<u>**CERTIFICATE OF SERVICE**</u>

I, Michael B. Slade, hereby certify that on April 15, 2011, a copy of the foregoing Motion

of Defendant Winston & Strawn LLP to Withdraw the Reference was served under the Court's

ECF system.

/s/ Michael B. Slade

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **In re:** | ) **Chapter 7** |
| | ) |
| **LANCELOT INVESTORS FUND, L.P., et al.** | ) **Case No. 08-28225** |
| | ) |
| **Debtors** | ) |
| | ) **Hon. Jacqueline P. Cox Presiding** |
| | ) |
| **RONALD R. PETERSON, as Chapter 7 Trustee** | ) |
| **For Lancelot Investors Fund, L.P., Lancelot** | ) |
| **Investors Fund II, L.P., Lancelot Investors** | ) |
| **Fund, Ltd., Colossus Capital Fund, L.P., and** | ) |
| **Colossus Capital Fund, Ltd.** | ) **Adv. Proc. No.** |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **WINSTON & STRAWN LLP** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Ronald R. Peterson, not individually but as Chapter 7 Trustee (the "Trustee") for the bankruptcy estates of Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital Fund, L.P. and Colossus Capital Fund, Ltd., hereby complains against Winston & Strawn LLP ("Winston") as follows:

## NATURE OF CLAIMS

These claims arise from Winston's conflicted representation (in derogation of Illinois Rules of Professional Conduct 1.7 and 1.16), failure to investigate (in derogation of Rules 1.1 and 1.3) and failure to disclose (in derogation of Rules 1.4 and 1.13).

## INTRODUCTION

2.     For purposes of these claims, the Trustee stands in the shoes of some privately offered investment funds known as: (a) Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P. and Colossus Capital Fund, L.P. (the "On-shore Funds"), and (b) Lancelot Investors Fund, Ltd. and Colossus Capital Fund, Ltd. (the "Off-shore Funds").

3.     Prior to October 20, 2008, all of the above referenced Funds were managed by Lancelot Investment Management, LLC and/or Colossus Capital Management (collectively "Management"), which were owned and controlled by Greg Bell ("Bell"). Management was the general partner of the On-shore Funds and the investment manager (pursuant to contract) of the Off-shore Funds. After August 2006, Bell was not an officer, director or employee of the Off-shore Funds. Bell did nothing to prevent Winston from fulfilling its fiduciary duties to the Funds.

4.     At all times relevant to these claims, Winston was legal counsel to Management, the On-shore Funds and the Off-shore Funds pursuant to Winston's August 25, 2005 engagement letter (Exh. A), which stated that Winston's clients would be Management and all privately offered investment funds managed by Management. Bell also became Winston's client at the time of the events described at ¶¶40-44. In its role as counsel for the Funds, Winston drafted Confidential Information Memoranda ("CIMs") -- i.e., private placement memoranda -- so the Funds could use the CIMs to solicit investors. As part of that solicitation effort, the CIMs touted that Winston was counsel to the Funds.

5.     At the outset of Winston's representation of the On-short Funds, Winston was conflicted because it was also representing Management, and those clients' interests conflicted (as explained herein). At the outset of Winston's representation of the Off-shore

2

Funds, Winston was conflicted because of (a) the above-referenced conflict between the Funds and Management, and (b) the conflict between the On-shore Funds and the Off-shore Funds, which were engaged in arms-length transactions with each other (as also explained herein).

6.    The On-shore and Off-shore Funds are insolvent, partly because Management caused the Funds to loan most of the Funds' assets to entities owned by or affiliated with Thomas J. Petters ("the Petters Entities"), and the Petters Entities were operating a Ponzi scheme that unraveled in September 2008. The Funds were also damaged by Winston's breaches of fiduciary duty described herein. The Trustee brings these claims to recover all damages proximately caused by Winston's breaches of its fiduciary duties to the Funds.

7.    Count I concerns (a) Winston's conflicted representation of both Management and the Funds, (b) Winston's failure to disclose that all the Funds needed to verify--but could not verify--the legitimacy of the "purchase order financing" plan underlying the Funds' loans to the Petters Entities, and (c) Winston's misleading statements (in the CIMs it prepared for the Funds), which created the false impression that such legitimacy had either already been verified or would be verified. In the normal course, Winston could satisfy its duty of disclosure to the Funds by making disclosure to Management/Bell. In the context of this claim, however, Winston could not satisfy that duty by making disclosure to Management/Bell because the material information that needed to be disclosed was already known to Management/Bell, whose interests (with respect to that information) conflicted with the Funds' interests. Thus, Winston needed to

make (but failed to make) disclosure of the verification problem to an unconflicted representative of each of the Funds.

8.      Count II concerns another consequence of Winston's conflicted representation of the Funds and Management -- Winston's failure to disclose to the Off-shore Funds that the structure of certain transactions between the On-shore Funds (represented by Winston) and the Off-shore Funds (also represented by Winston) provided for an excessive fee to be paid by the Off-shore Funds to Management (also represented by Winston). Again, in this context, Winston could not satisfy its duty to the Off-shore funds by making disclosure to Management/Bell because the material information that needed to be disclosed was already known to Management/Bell, whose interests (with respect to that information) conflicted with the Off-shore Funds' interests. Thus, in addition to the fact that Winston should not have been representing the On-shore Funds, the Off-shore Funds and Management, Winston needed to make (but failed to make) disclosure of the excessive fee to an unconflicted representative of the Off-shore Funds.

9.      Count III concerns the period of time in and around December 2007-May 2008, when Winston was improperly representing all of the Funds and Management, and Bell raised questions to Winston regarding: (a) the prioritization of his claim to deferred compensation in the event of the Funds' insolvency, (b) his desire to borrow money collateralized by his claim for deferred compensation, and (c) his desire to protect his personal assets by placing them in an off-shore asset protection trust. Those inquiries to Winston, in the context of the then status of the Funds, created a circumstance such that a competent, unconflicted lawyer would have initiated an investigation into what was causing Bell's concerns. Winston was obligated to determine whether those issues

4

implicated actual or potential threats to the financial integrity of the Funds. However, rather than pursuing this mandated investigation and taking appropriate action in response to such an investigation, Winston defaulted and compounded that fiduciary default by undertaking yet another conflicted representation--this time of Bell individually. Winston's conflicted representation of Bell effectively negated Winston's ability to address the material issues raised by Bell's inquiries. Accordingly, Winston failed to adequately represent the Funds as mandated by Illinois Rule of Professional Conduct 1.1, Winston's fiduciary duties were compromised and Winston's actions/failures to act violated the mandates of at least Rules 1.3, 1.4, 1.7, 1.13 and 1.16 (as those Rules existed in 2008) and the Restatement (Third) of the Law Governing Lawyers.

## GENERAL ALLEGATIONS

### The Parties

10.     On October 20, 2008, the On-shore Funds and the Off-shore Funds (i.e., the Debtors) filed a petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are being jointly administered under the caption *In re Lancelot Investors Fund, L.P., et al.*, case no. 08-28225. The United States Trustee for the Northern District of Illinois duly appointed Ronald R. Peterson as Trustee under 11 U.S.C. 701(a)(1) of the Bankruptcy Code by orders dated October 20, 2008. The Trustee brings this Adversary Complaint as trustee and not individually.

11.     Lancelot Investors Fund, L.P. is a Delaware limited partnership with its principal place of business in Northbrook, Illinois.

12.     Lancelot Investors Fund II, L.P., is a Delaware limited partnership with its principal place of business in Northbrook, Illinois.

13. Lancelot Investors Fund, Ltd. is a hedge fund incorporated in the Cayman Islands with its principal place of business in Northbrook, Illinois.

14. Colossus Capital Fund, L.P. is a Delaware limited partnership with its principal place of business in Northbrook, Illinois.

15. Colossus Capital Fund, Ltd, is a hedge fund incorporated in the Cayman Islands with its principal place of business in Northbrook, Illinois.

16. Defendant Winston & Strawn LLP is a law firm headquartered in Chicago, Illinois.

### Jurisdiction and Venue

17. This Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and (e) because this adversary proceeding is related to *In re Lancelot Investors Fund, L.P., et al.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, jointly administered as Case No. 08-28225.

18. This adversary proceeding is not a core proceeding, but is otherwise related to a case under Title 11 within the meaning of 28 U.S.C. § 157(c). Plaintiffs consent to the entry of a final judgment.

19. Venue is proper pursuant to 28 U.S.C. § 1409(a).

### Background

20. Between approximately June 2002 and September 2008, the On-shore Funds and Off-shore Funds were created to be "feeder funds" for the Petters Entities, which were purportedly engaged in "purchase order financing." In theory, certain of the Funds would loan money to the Petters Entities to be used for purchasing consumer electronics from U.S. suppliers in exchange for promissory notes made payable to the Funds that originated

the loans, secured by both accounts receivable from the retailers and the electronics which

the retailers purchased. In theory, the Petters Entities would then repay the notes with the

proceeds from the sales of the electronics to the retailers.

21.    In fact, however, the loans from the Funds were financing a massive Ponzi

scheme which resulted in the loss of billions of dollars. There were no purchase orders

from retailers and there were no goods. Thus, to the extent that the Petters Entities repaid

the Funds' loans (with interest) prior to the collapse of the scheme, they did so with

investor money from the Funds.

22.    The scheme was uncovered in September 2008, by a federal investigatory

task force assembled in the District of Minnesota. As described in the October 2, 2008,

Affidavit of an FBI Special Agent (the "FBI Affidavit"):

> The primary method of effectuating the fraud scheme
> involves PETTERS, his employees, and his associates
> creating fictitious documents and then providing these
> documents to current and potential investors as evidence
> that PCI is buying and selling substantial goods and
> merchandise which PCI will then resell. In many instances,
> funds from investors are sent directly to the purported
> supplier of the merchandise, AIR or ENCHANTED. In
> turn, AIR or ENCHANTED direct the funds to PCI (less a
> commission) without any merchandise. PETTERS and
> other persons then fraudulently pledge the non-existent
> goods and merchandise as security for the investments.

23.    In the federal investigation, FBI agents took the phony purchase orders

and invoices directly to Sam's Club and Costco Wholesale to obtain confirmation of their

legitimacy, and were immediately informed that they were completely bogus. According

to the FBI Affidavit, the Petters Entities knew this could happen and discussed it among

themselves: "[I]f investors send auditors out to visit warehouses where the merchandise

is located, … the scheme would implode."

## COUNT I

### BREACH OF FIDUCIARY DUTY OWED
### TO ON-SHORE AND OFF-SHORE FUNDS

24.     The Trustee realleges and incorporates by reference paragraphs 1-23.

25.     At the time Winston began representing the Funds, Winston knew (through Bell) that (a) neither Bell nor any of his affiliates had ever verified (or ever would be permitted to verify) the existence of the electronics that supposedly collateralized the loans made to the Petters Entities, and (b) neither Bell nor any of his affiliates had ever verified (or ever would be permitted to verify) that the retailers appearing as "purchasers" on the purchase orders were in fact purchasing any goods from the Petters Entities.   Moreover, because Winston drafted the CIMs for the Funds, Winston knew that the CIMs failed to disclose to the Funds (or to potential investors in the Funds) that the Funds would not be permitted to verify the legitimacy of the "purchase order financing" plan.   Indeed, the CIMs created the false impression that such legitimacy had either already been verified or would be verified.   For example, the CIMs stated:

> As indicated above, the General Partner anticipates that the Fund's assets will be invested primarily in Notes, which the Fund will originate.... It is anticipated that the Notes originated by the Fund will evidence loans made to one or more independently controlled special purpose vehicles (the "SPVs") which engage in the business of acquiring goods and selling such goods to major retailers ("Retailers"). Each SPV will use the proceeds from such Notes to finance the acquisition of goods (the "Underlying Goods"), which such SPV sells to a Retailer.... The Fund will enter into Notes only in circumstances where the SPV has a pre-existing, binding agreement with a Retailer to sell the Underlying Goods to such Retailer on a future date (a "Purchase Order"). As a result of such Purchase Orders, the Fund will assume little or no inventory risk with respect

> to the Underlying Goods.... With respect to each Note
> entered into by the Fund, the Fund will require collateral
> generally equal to 120% of the value of the Note. The
> Fund will have a security interest in the Underlying Goods
> which will be protected through the use of a proof of
> encumbrance fling under Article 9 of the Uniform
> Commercial Code.... The General Partner will originate
> Notes based on the ... sufficiency of the collateral.

(January 2006 Lancelot Investors Fund L.P. CIM, Exhibit B hereto, at pp. 5-7; see also

Exhibits C and D.)

26.     At the same time Winston was representing the Funds, it was also serving

as counsel to Management (which was owned/controlled by Bell). Management/Bell

received fees from the Funds in the amount of 2% of the net asset value per share. It was,

therefore, in Management/Bell's interest to increase the amount of the Funds' investable

assets, even though those assets were to be invested in loans for which Management/Bell

(and Winston) knew there could be no verification of the *bona fides* of (a) the purchase

orders, or (b) the goods supposedly securing the Funds' loans to the Petters Entities. The

interests of Winston's two sets of clients--Management/Bell on the one hand and the

Funds on the other--were, therefore, in conflict and Winston knew of the conflict. Thus,

Winston should not have been representing both Management and the Funds.

27.     Moreover, because Winston owed the Funds a fiduciary duty of

disclosure, Winston had a duty to disclose the facts in ¶25 (the "verification problem")

because those facts were material to whether there was, in fact, any purchase orders from

the retailers or any goods securing the Funds' loans to the Petters Entities. In the normal

course of its attorney-client relationship, Winston could make disclosures to the Funds

through Management/Bell. In this context, however, Winston could not satisfy its duty to

the Funds by making disclosure to Management/Bell because, due to the conflicting

Case 0:10-cv-03846-DSD Document 1 Filed 04/21/11 Page 17 of 16
Case 0:09-cv-02741-PJS Document 120-1 Filed 04/21/11 Page 26 of 126 Exhibit A
Document Page 10 of 16

interests between Management/Bell and the Funds, Management/Bell was not likely to (a) act in the interests of the Funds which conflicted with the interests of Management/Bell, or (b) alert any non-conflicted person at any of the Funds who would be likely to act in the interests of the Funds, rather than in the interests of Management/Bell.

28.     In this context, Winston needed to disclose the verification problem to unconflicted representatives of the Funds. Winston breached its duty by failing to make such disclosure. Moreover, Winston misled the Funds by drafting CIMs for the Funds which stated that there were purchase orders with retailers and goods collateralizing the loans, even though Winston knew there was no way to verify those statements.  (See quote in ¶25.)

29.     If Winston had made the necessary disclosure, the Funds would have conducted an investigation and quickly discovered that:

   (a)     the retailers--whose names appeared on the purchase orders--had not issued any such purchase orders;

   (b)     there were no electronics or any other goods serving as collateral for the loans to the Petters Entities; and

   (c)     the CIMs soliciting new investors were misleading, which exposed the Funds to potential fraud claims.

30.     As a proximate result of Winston's breaches of fiduciary duty, the Funds continued to invest in loans to the Petters Entities, unaware that those loans were secured by non-existent purchase orders and non-existent collateral.  Thus, when the Petters Ponzi scheme unraveled, the Funds had no source to recover the amounts loaned.  As a further

proximate result of Winston's breaches of fiduciary duty, the Funds became the targets of fraud claims when the Petters Ponzi scheme unraveled. Therefore, the Trustee seeks to recover all of the Funds' damages of which Winston's breach was a proximate cause, the amount of which will be proved at trial.

## COUNT II

### BREACH OF FIDUCIARY DUTY OWED
### TO THE OFF-SHORE FUNDS

31.    The Trustee realleges and incorporates paragraphs 1-30 as paragraph 31.

32.    As explained in Count I, Winston represented Management and all of the Funds even though there were conflicts of interest between those two sets of clients. As explained below, Winston also represented both the On-shore and Off-shore Funds despite conflicts of interest between those clients, and that conflicted representation contributed toward another failure to disclose.

33.    When the On-shore Funds made loans to the Petters Entities, the transactions were structured directly between the On-shore Funds and the Petters Entities. In contrast, when the Off-shore Funds made loans to the Petters Entities, the transactions were structured differently for tax purposes. In that regard, the Off-shore Funds used the On-shore Funds as an intermediary in making their loans to the Petters Entities. That structure required there to be arms-length transactions between the Off-shore Funds (represented by Winston) and the On-shore Funds (also represented by Winston). Consequently, the Off-shore Funds should have had independent counsel for those transactions where, for all practical purposes, the On-shore Funds were the borrower and the Off-shore Funds were the lender.

11

34.     The transactions between the Off-shore Funds and the On-shore Funds provided for a management fee to be paid by the Off-shore Funds to Management (also represented by Winston). That management fee was excessive because the On-shore Funds had already fully paid Management for managing the loans, and Winston knew it. Accordingly, this was material information that the Off-shore Funds needed to know and that Winston needed to disclose.

35.     In the normal course, Winston could make disclosures to the Off-shore Funds through Management/Bell. In this context, however, Winston could not satisfy its duty to the Off-shore Funds by making disclosure to Management/Bell because, due to the conflicting interests between Management/Bell and the Off-shore Funds, Management/Bell was not likely to (a) act in the interests of the Off-shore Funds which conflicted with the interests of Management/Bell, or (b) alert any non-conflicted person at the Off-shore Funds who would be likely to act in the interests of the Off-shore Funds, rather than in the interests of Management/Bell.

36.     In this context, Winston needed to make disclosure to an unconflicted representative of the Off-shore Funds, but Winston breached its duty by failing to disclose Management's excessive fee.

37.     If the Off-shore Funds had been provided with independent counsel, or if Winston had made the necessary disclosure, the Off-shore Funds would have refused to pay the excessive fee to Management. As a proximate result of Winston's breaches of fiduciary duty, the Off-shore Funds paid Management more than $50,000,000 of excessive fees. Therefore, the Trustee seeks to recover those damages, the amount of which will be proved at trial.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### OWED TO THE ON-SHORE AND OFF-SHORE FUNDS

38.    The Trustee realleges and incorporates paragraphs 1-37 as paragraph 38.

39.    In approximately December 2007, Bell became concerned about the Petters' Entities' late repayments on the loans from the Funds.  Those late repayments caused Bell to become insecure about the Funds' ability to pay its liabilities, including the Off-shore Funds' obligation to pay Bell $100 million of deferred compensation. Stated another way, Bell became concerned that (a) the Funds could be insolvent and file for bankruptcy, (b) his deferred compensation would be at risk of not being paid because of bankruptcy rules which prioritize creditors' claims, and (c) if the Funds were indeed insolvent--contrary to the picture painted in the Funds' CIMs--Bell could be facing lawsuits which would put his own on-shore assets at risk.

40.    In the context of Winston's tainted representation of the Funds (see conflicts described in Counts I and II), Bell began raising questions with Winston about (1) how his claim for deferred compensation would be prioritized among other Fund creditors in the event of the Funds' insolvency, (2) how he could borrow money collateralized by his  deferred compensation, and (3) how he could protect his personal assets in an off-shore asset protection trust.

41.    A competent, unconflicted law firm in that situation would have initiated an investigation into the reasons for Bell's inquiries/concerns.  (Rules 1.1 and 1.3) Such an investigation would have quickly uncovered that:

(a)    the Petters Entities were not repaying the loans and could not repay the loans;

(b)     in order to hide that fact, Bell had begun sending new investor money to
the Petters Entities so that the Petters Entities could (and did) send money
back to the Funds to create the appearance of loan repayments;[1]

(c)     the "round-trip" transactions needed to be stopped;

(d)     the solicitation of new investor money needed to be stopped;

(e)     efforts to recover money from the Petters Entities needed to be initiated;

(f)     Bell needed to be replaced; and

(g)     the decision-makers needed to determine what other measures were
necessary to mitigate the Funds' losses.

The conflicted Winston firm, however, initiated no such investigation and took no
appropriate action in response to such an investigation.

42.     Instead, the conflicted Winston firm defaulted on its fiduciary obligations
and compounded that default by undertaking yet another conflicted representation--this
time of Bell individually.

43.     By May 2008, Winston was advising Bell on all three of the questions
listed in ¶40, with one limited exception regarding issue (1)--the prioritization of Fund
creditors in the event of insolvency. In that regard, Winston informed Bell that although
it could advise him about prioritization in the event of insolvency of the On-shore Funds
(which are governed by U.S. law), it could not advise him about prioritization in the
event of insolvency of the Off-shore Funds (which are governed by Cayman Islands law);
that advice would have to come from Cayman Islands counsel.

44.     Consequently, Bell requested Winston's assistance in securing legal
advice    on    prioritization    from    Cayman    Islands    counsel    specializing    in

---

[1]     The FBI has characterized these transactions as "round-trips".

bankruptcy/creditors' rights issues. In May 2008, Winston facilitated the procurement of such legal advice for Bell and, in doing so, it passed along Bell's emphasis that he needed this advice "as soon as possible." Still, Winston conducted no investigation and took no appropriate action.

45.     Winston's conflicted representation of Bell effectively negated Winston's ability to address the material issues regarding the Funds raised by Bell's inquiries. Accordingly, Winston failed to adequately represent the Funds as mandated by Rule 1.1, Winston's fiduciary duties were compromised and Winston's actions/failures to act violated the mandates of at least Rules 1.3, 1.4, 1.7, 1.13 and 1.16 (as those Rules existed in 2008) and the Restatement (Third) of the Law Governing Lawyers.

46.     As a proximate result of Winston's breach of fiduciary duty:

(a)     the Funds did not know (until on or about October 2, 2008) that the Petters Entities were not repaying the loans and could not repay the loans;

(b)     the Funds did not know that Bell had hidden that fact by engaging in "round-trip" transactions with the Petters Entities;

(c)     the "round-trip" transactions with the Petters Entities continued, thereby increasing the Funds' losses into the Petters Ponzi scheme;

(d)     the solicitation and collection of new investor money continued, thereby exposing the Funds to fraud claims;

(e)     no efforts to recover money from the Petters Entities were initiated;

(f)     Bell was not replaced; and

(g)     the decision-makers did not take measures to mitigate the Funds' losses.

Therefore, the Trustee seeks to recover all of the Funds' damages from which Winston's breach of fiduciary duty was a proximate cause.

WHEREFORE, the Trustee respectfully requests that judgment be entered for the Trustee in the amount of the damages proximately caused by Winston's breaches of fiduciary duty described in Counts I -III.

Dated: February 22, 2011            Respectfully submitted,

RONALD R. PETERSON, not individually but as Chapter 7 Trustee for Lancelot Investors Fund, L.P., *et al.*

By: __/s/ Edward T. Joyce_____
One of his attorneys.

Edward T. Joyce (ARDC # 01371835)
Arthur W. Aufmann (ARDC # 6183448)
Rowena T. Parma (ARDC # 6209690)
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 South LaSalle Street
Suite 2200
Chicago, Illinois 60603
Telephone: (312) 641-2600
Facsimile: (312) 641-0360

*Special Counsel for Chapter 7 Trustee*

# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| | ) Case No. 08-28225, *et al.* |
| | ) (Jointly Administered) |
| **LANCELOT INVESTORS FUND, L.P.,** *et al.* | ) |
| | ) Hon. Jacqueline P. Cox |
| | ) |
| Debtors. | ) **Hearing Date: Sept. 15, 2010** |
| | ) **Hearing Time: 9:30 a.m.** |

## MOTION FOR ENTRY OF AN ORDER ESTABLISHING
## OMNIBUS PROCEDURES FOR SETTLEMENT OF AVOIDANCE CLAIMS

Ronald R. Peterson, not individually but as chapter 7 trustee (the "Trustee") of the bankruptcy estate of Lancelot Investors Fund, L.P., *et al.*[1] (collectively "Lancelot" or the "Debtors") hereby submits this motion (the "Motion"), pursuant to sections 105(a), 363 and 502(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 9007 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order establishing omnibus procedures ("Omnibus Procedures") for the settlement of claims and causes of action threatened in connection with, or brought by the Trustee pursuant to sections 544, 547, 548, 550 and 553 of the Bankruptcy Code to recover, preferential and/or fraudulent transfers received by various entities or individuals from the Debtors (the "Avoidance Claims"). In support of the Motion, the Trustee respectfully states as follows.

---

[1] The Lancelot-related debtors consist of Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital Fund, L.P., Colossus Capital Fund Ltd. and fourteen related affiliates.

### Jurisdiction and Venue

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief sought herein are sections 105(a), 363 and 502 of the Bankruptcy Code and Rules 9007 and 9019 of the Bankruptcy Rules.

### Background

3.    On October 20, 2008 (the "Petition Date"), Lancelot commenced voluntary chapter 7 cases in the Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), bankruptcy case number 08-28225.

4.    Ronald R. Peterson was subsequently appointed trustee of the Debtors, and is now the duly qualified permanent case trustee.

5.    After a thorough investigation by the Trustee, assisted by his counsel and financial consultants, the Trustee has identified numerous parties who appear to have received transfers from the Debtors subject to avoidance pursuant to sections 544, 547, 548, 550 and 553 of the Bankruptcy Code and Illinois law. On May 27, 2010, the Trustee began the process of pursuing such Avoidance Claims by sending demand letters to the recipients of such transfers (the "Transferees"). Demand letters relating to more than 100 accounts have been mailed, demanding the return of avoidable transfers totaling more than $380 million transferred from the Debtors prior to the Petition Date. Although settlement appears to be forthcoming in response to several of the demand letters, the Trustee anticipates filing numerous adversary proceedings to recover on the Avoidance Claims in connection with these chapter 7 cases.

**Relief Requested**

6.     To minimize costs and administrative burdens, for both the Trustee and the Court, the Trustee seeks this Court's approval of an order authorizing him to compromise and settle Avoidance Claims pursuant to the omnibus procedures outlined herein and attached hereto as Exhibit A.

**Basis for Relief**

7.     The Trustee has asserted Avoidance Claims against over one hundred Transferees. If the Trustee is required file separate 9019(a) motions to obtain Court approval for the settlement of each individual Avoidance Claim, the Trustee will incur significant costs associated with preparing, filing and serving separate motions for each proposed settlement and will unnecessarily clog the Court's docket and burden the Court and its staff. Moreover, with respect to the many smaller Avoidance Claims, the cost of pursuing individual 9019(a) settlement motions may materially effect the Trustee's net recovery on settlements. Finally, as previously described to the Court, the Trustee believes that maintaining the confidentiality of settlement terms will enhance the value of the estates by preventing Transferees from negotiating with the Trustee with the benefit of the knowledge of the Trustee's track record with respect to prior settlements. Therefore, the Trustee desires to establish omnibus procedures in these Chapter 7 Cases for the settlement of Avoidance Claims that will allow him to enter into settlements, within certain parameters disclosed only to the Court, on a more cost-effective and expeditious basis.

## The Proposed Omnibus Procedures

8.      The Trustee proposes that he be authorized to settle Avoidance Claims, without

further notice or hearing, upon compliance with the omnibus procedures (the "Omnibus

Procedures") described below and attached hereto as  Exhibit A:

a.      In his discretion the Trustee will pursue recovery of certain transfers avoidable
        pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or Illinois
        law.  The Trustee will agree to settle such claims, within the settlement authority
        parameters set forth on Exhibit A, in his reasonable business judgment,
        considering the following factors: (a) the probability of success if the claim were
        litigated or arbitrated; (b) the complexity, expense and likely duration of any
        litigation or arbitration with respect to the claim; and (c) the fairness of the
        settlement vis-à-vis the Debtors' estates and their creditors.

b.      As described in Exhibit A, the Trustee proposes varying settlement parameters in
        which he is authorized to settle Avoidance Claims, without any further approval
        of the Court.  The settlement parameters proposed are dependent upon both the
        type of the claim and the amount asserted.  The Trustee proposes parameters for
        settling the following categories of claims:

        •       De minimus transfers, as described on Exhibit A.

        •       Preferential transfers avoidable pursuant to sections 547(b) and 550 of the
                Bankruptcy Code.

        •       Fraudulent transfers occurring after February 26, 2008 which can be
                pursued pursuant to sections 548(a)(1)(A) and 550 of the Bankruptcy
                Code.

        •       Fraudulent transfers occurring prior to February 26, 2008 which can be
                pursued pursuant to sections 548(a)(1)(B) and 550 of the Bankruptcy Code
                and/or 740 ILCS 160/5(a)(2), 160/6(a) and 160/8(a) (or similar laws of
                other states), and sections 544(b)(1) and 550 of the Bankruptcy Code.

c.      In his discretion and without further court approval, the Trustee shall be
        authorized to negotiate with Transferees regarding the provision of a general
        prepetition, unsecured claim pursuant to section 502(h) of the Bankruptcy Code
        for the amount of money that is returned to the estates under the applicable
        settlement agreement.

d.      Nothing herein shall prejudice the Trustee's right (a) to seek Court approval of a
        settlement by a separate motion filed pursuant to Rule 9019(a) of the Bankruptcy
        Rules, or (b) to pursue or decline to pursue any action against any Transferee for
        any Avoidance Claim by filing an adversary proceeding or otherwise.

9.    The Trustee has proposed separate settlement authority for transfers made before and after February 26, 2008 because, based on the Trustee's investigation to date, and the guilty plea entered by the funds' former principal, Greg Bell, the Trustee believes that as of February 26, 2008 Bell began making a series of fictitious "round trip" transactions with Petters, designed to hide from investors the fact that Petters was no longer able to make good on its notes outstanding to the funds. In effect, when the Petters' Ponzi scheme began to collapse and Petters became unable repay the notes it had issued to the funds, Bell had a choice. He could have chosen to acknowledge the defaults by Petters, with the consequence that new investors would have been scared away from his funds, heavily invested as they were in Petters notes that were beginning to default. But instead he chose to hide the problem from investors with "round trip" transactions which were used to "refresh" the funds receivables, so he could continue to entice new investors into the funds. Effectively, when the Petters' Ponzi scheme began to unravel, Bell responded by converting his own funds into a second level Ponzi scheme in an attempt to keep them afloat. As a result, any transfers he made to redeeming investors after February 26, 2008 were made with the actual intent to hinder, delay or defraud creditors and are avoidable, unlike transfers made before February 26, 2008, under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

**Applicable Authority in Support of Proposed Omnibus Procedures**

10.    The Bankruptcy Code authorizes the Trustee to enter into settlements. Section 363 is the statutory vehicle for considering approval of settlements under Bankruptcy Rule 9019. *In re Sparks,* 190 B.R. 842, 845 (Bankr. N.D. Ill. 1996), *aff'd* 1997 WL 156488 (N.D. Ill. 1997); *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 n.2 (3rd Cir. 1996); *In re Dow Corning Corp.,* 198 B.R. 214, 247 (Bankr. E.D. Mich. 1996). Compromises are a normal part of the bankruptcy

process. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 423 ((1968). As a matter of policy, compromises and settlements are favored in order to minimize litigation, reduce administrative costs, and expedite administration of the estate. *Martin*, 91 F.3d at 393; *Fogel v. Zell,* 221 F.3d 955, 960 (7th Cir. 2000).

11.    Bankruptcy Rule 9019(b) empowers the Court to approve procedures for the settlement of classes of controversies by a Trustee by providing that: "[a]fter a hearing … the court may fix a class or classes of controversies and authorize the trustee to compromise or settle controversies within such class or classes without further hearing or notice." FED. R. BANKR. P. 9019(b). Rule 9019(b) provides a "mechanism to 'pre-approve' settlements of claims that might be too numerous for efficient administration under the requirements of 9019(a)." *In re Applegate,* Case No. 05-67759, 2007 WL 4365681, *2 (Bankr. N.D. Ohio, 2007). This subsection "'permits the court to deal efficiently with a case in which there may be a large number of settlements.'" *Id.* (approving the use of Rule 9019(b) where the Trustee filed eighty-six adversary proceedings in connection with a Ponzi scheme debtor) (citing FED. R. BANKR. P. 9019 Advisory Committee Note (1983)). Procedures designed to streamline the claims settlement process, including the settlement of Avoidance Claims, have been approved in other large bankruptcy cases in this district. *See In re United Airlines,* Case No. 02-48191 (Bankr. N.D. Ill. Aug. 23, 2004); *In re Kmart Corp.,* Case No. 02 B 02474 (Bankr. N.D. Ill. Jan. 25, 2002); *In re National Steel Corp.,* Case No. 02-08699 (Bankr. N.D. Ill. Mar. 6, 2002); *In re Comdisco, Inc.,* Case No. 02-24795 (Bankr. N.D. Ill. July 16, 2001); *In re Line Capital Inc.,* Case No. 01-03320 (Bankr. N.D. Ill. Mar. 2, 2001).

12.    This case is similar. The Trustee has identified over 100 Transferees with potentially avoidable transfers. The Omnibus Procedures are reasonable and appropriate based

on this large number of Avoidance Claims and the administrative burden on both the Court and the estates that would result from having to settle each of them pursuant to Rule 9019(a). The Omnibus Procedures will encourage resolution of claims and causes of action, thereby eliminating unnecessary expenditures of time and money with respect to disputes. To seek approval to resolve each of the numerous disputes covered by the Omnibus Procedures would be unduly burdensome on the Court and an unnecessary drain on the time and other resources of the Trustee and his counsel and the resources of other creditors and parties in interest. Moreover, the expense of seeking court approval for every Avoidance Claim settlement would significantly reduce the benefits of many smaller settlements. Thus, after careful analysis and in the exercise of his sound business and litigation judgment, the Trustee has determined and respectfully submits that for judicial efficiency and maximizing the value of the Debtors' estates, the Omnibus Procedures should be approved.

13. In addition, the settlement authority proposed would, in any event, be well within the range of reasonableness for approval of settlements under Rule 9019(a). The benchmark for determining the propriety of a bankruptcy settlement under Fed. R. Bankr. P. 9019(a) is whether the settlement is fair and equitable and in the best interests of the estate. *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994); *In re Energy Coop., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989); *LaSalle Nat'l Bank v. J. William Holland, Chapter 7 Trustee for the Estate of Am. Reserve Corp. (In re Am. Reserve Corp.)*, 841 F.2d 159, 161-162 (7th Cir. 1987) (explaining same and instructing that any distinction between the "best interests of the estate" and the "fair and equitable" standards is of little consequence). More specifically, "[t]his determination requires a 'comparison of the settlement's terms with the litigation's probably costs and probably benefits.'" *Grochinski v. Kennedy (In re Miller)*, 148 B.R. 510, 516 (Bankr. N.D. Ill. 1992)

(internal citations omitted). Furthermore, "[in] making this comparison the bankruptcy judge should consider 'the litigation's probable costs and probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay.'" *Id.* (internal citations omitted).

14.    In determining whether a proposed settlement is fair and equitable, neither an evidentiary hearing nor a rigid mathematical analysis is required. *Depoister*, 36 F.3d at 586, 588; *In re Energy Coop.*, 886 F.2d at 928-929. Rather, the court must determine whether the proposed compromise fall within the reasonable range of litigation possibilities. *In re Energy Coop.*, 886 F.2d at 929; *In re Am. Reserve*, 841 F.2d at 161.

15.    Here, without going into the specific settlement authority proposed by the Trustee (which is redacted pursuant to order of this Court), it should be clear to the Court that the authority requested is not unduly generous to the Trustee. The settlement authority proposed herein will require that, in order to settle Avoidance Claims, the Trustee must make significant recoveries. In light of the expenses and risks of litigation, the Trustee suggests that settlements which conform to the parameters proposed on Exhibit A would in any event easily satisfy the standards of Rule 9019(a).

WHEREFORE, the Trustee respectfully requests the Court enter an order, substantially in the form attached hereto, (a) authorizing and approving omnibus procedures for the settlement of Avoidance Claims, and (b) granting the Trustee such further relief as is just and proper.

Dated: September 7, 2010

Respectfully submitted,

RONALD R. PETERSON, Chapter 7 Trustee of the Bankruptcy Estate of LANCELOT INVESTORS FUND, L.P., *et al.,*

By:_____ */s/ Ronald R. Peterson*_____
                One of his attorneys

Ronald R. Peterson (ARDC # 2188473)
Michael S. Terrien (ARDC # 6211556)
Angela M. Allen (ARDC # 6295519)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL  60654
Phone: (312) 222-9350
Facsimile: (312) 527-0484

*Counsel for the Trustee*

Case 1:04-cv-02603-DC Document 4-15 Filed 04/16/04 Page 1 of 28 Desc Exhibit C
Case 1:04-cv-02603 Document #: 1 Filed: 04/15/04 Page 23 of 126 PageID #:
Page 1 of 28

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| LANCELOT INVESTORS FUND, L.P., *et al.* | ) | Case No. 08-28225, *et al.* |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| | ) | Hon. Jacqueline P. Cox Presiding |
| ———————————————————— | ) | |
| | ) | |
| RONALD R. PETERSON, as Chapter 7 Trustee | ) | |
| for Lancelot Investors Fund, L.P., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. _____ |
| | ) | |
| GREGORY BELL, LANCELOT INVESTMENT | ) | |
| MANAGEMENT LP, COLOSSUS CAPITAL | ) | |
| MANAGEMENT, LP, LANCELOT | ) | |
| MANAGEMENT, INC., and LANCELOT | ) | |
| HOLDINGS, LP | | |
| Defendants. | | |

**COMPLAINT**

Ronald R. Peterson (the "Trustee"), not individually, but as the Chapter 7 Trustee for the

estate of Lancelot Investors Fund, L.P., *et al.* (the "Debtors"), hereby complains as follows:

**NATURE OF THE ACTION**

1.      This is an adversary proceeding by the Trustee against Gregory Bell ("Bell"),

Lancelot Investment Management LP ("LIM"), Lancelot Management, Inc., Lancelot Holdings,

LP ("Lancelot Holdings"), and Colossus Capital Management, LP ("Colossus Management," and

with LIM, Lancelot Management, Inc., and Lancelot Holdings, the "Management Companies")

(collectively, "Defendants") on behalf of five hedge fund Debtors - Lancelot Investors Fund,

L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital Fund, L.P., and Colossus Capital Fund, Ltd. (together the "Funds").

2.      Prior to October 20, 2008, the date on which the Funds and their affiliated debtors filed for Chapter 7 protection in this Court, the Funds were controlled by Bell, through various levels of management companies set up by Bell.  Under applicable limited partnership and other agreements, the authority to make investment decisions on behalf of the Funds was delegated to Bell, through management companies controlled by Bell.  Bell made most of the significant investment, management, and operational decisions regarding the Funds.

3.      On information and belief, as of October 20, 2008, the Debtors collectively had assets with a book value of $1.8 billion.  Those assets were comprised predominantly of notes (the "Notes") purchased from a special purpose vehicle, Thousand Lakes, LLC ("Thousand Lakes"), which was controlled by and affiliated with Thomas J. Petters ("Petters") and Petters Company International ("PCI").  The Notes were purportedly secured by certain goods and merchandise owned by Thousand Lakes and/or certain vendors, Enchanted Family Buying Company ("Enchanted") or Nationwide International Resources ("NIR" and together the "Vendors").

4.      Bell and his Management Companies, through their own special purpose entity, RWB Services ("RWB"), served as commercial lenders to PCI by purchasing Notes from Thousand Lakes.  The Notes were issued by Thousand Lakes ostensibly to finance the purchase of consumer electronics and other so-called "brown goods" to fulfill alleged purchase orders from major retailers such as Sam's Club, Costco, Boscov's, and others (the "Retailers").  In fact, the Notes were issued in connection with a multi-billion dollar Ponzi scheme orchestrated by Petters and his co-conspirators.

5.      As part of the alleged scheme, Petters and his co-conspirators created fictitious invoices, purchase orders, and other documents, and used the money they had received from lenders such as the Funds to (a) make disbursements and other payments to earlier lenders, and (b) enrich themselves.

6.      As a result of the Ponzi scheme orchestrated by Petters and his co-conspirators, the goods and merchandise in which the Funds purportedly held a perfected security interest never existed and certain pre-existing binding purchase orders allegedly provided to Bell and the Funds are forgeries.  Accordingly, the Notes held by the Funds are worthless and the collateral allegedly pledged to the Funds as security for the Notes is nonexistent.

7.      From 2002 through 2008, Bell and the Management Companies raised more than $2.5 billion by selling interests in the Funds to hundreds of investors throughout the United States and in several foreign countries.  The investors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds.

8.      Bell, through his Management Companies, engaged in negligence in managing the Funds by failing to conduct sufficient investigations to verify the legitimacy of the activities of Thousand Lakes, Petters, and PCI and to confirm the validity of the collateral, security interests, and guarantees that were supposed to be obtained as security for repayment of the Notes.

9.      Beginning on or about February 26, 2008, after Thousand Lakes had been delinquent in repaying various Notes, Bell joined the Ponzi scheme.  Bell (through the Management Companies, including LIM) and Petters (through PCI) concocted a series of "roundtrip" payments to conceal Thousand Lakes' delinquencies.  On multiple occasions, Bell and his Management Companies, including LIM, sent Fund money directly to PCI under the

pretense that the money was for investment in a new Note. PCI then returned the money to the

Funds' accounts, typically on the same day, to satisfy one or more outstanding Notes owed to the

Funds.

10. Bell and Petters each have been charged criminally. On October 7, 2009, Bell

pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C § 1343, solely for his role

in the "roundtrip" payments that occurred in 2008. On December 2, 2009, Petters was convicted

of twenty criminal counts, including mail and wire fraud, money laundering, and obstruction of

justice.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this

adversary proceeding arises in, is related to, and arises under the Chapter 7 case, *In re Lancelot

Investors Fund, L.P., et al.*, pending in the United States Bankruptcy Court for the Northern

District of Illinois, Eastern Division, jointly administered as Case No. 08-28225.

12. This Court has personal jurisdiction over Bell pursuant to 735 ILCS 5/2-209

because, among other things, he resides in Illinois, transacted business within Illinois, committed

tortious acts within Illinois, and breached fiduciary duties within Illinois.

13. This Court has personal jurisdiction over the Management Companies pursuant to

735 ILCS 5/2-209 because, among other things, they transacted business within Illinois,

committed tortious acts within Illinois, and breached fiduciary duties within Illinois.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

15. This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## THE PARTIES AND RELATED ENTITIES

16.     Plaintiff Ronald R. Peterson is the Chapter 7 Trustee for the Debtors, duly appointed under 11 U.S.C. § 701(a)(1) of the United States Bankruptcy Code by Orders of this Court dated October 20, 2008.

17.     The Debtors consist of 19 related entities engaged in the operation of related hedge funds or special purpose vehicles.  As set forth in the following chart, each of the Debtors was ultimately controlled by Bell, through various levels of management companies set up by Bell.



18.     Defendant Bell (a/k/a Gregory Belinkov) is a citizen of the State of Illinois, residing in Highland Park.  Bell is the sole principal owner of the Management Companies and

had exclusive discretionary authority over the assets of the Funds. Bell personally represented, either as the agent, director, manager, or partner, each of the Funds, the Management Companies, and various affiliates.

19. Defendant Lancelot Investment Management LP (f/k/a Lancelot Investment Management, LLC) (previously defined as "LIM") is a Delaware limited partnership, with its principal place of business located in Illinois.

20. Defendant Lancelot Management, Inc. is a Delaware corporation, with its principal place of business located in Illinois.

21. Defendant Lancelot Holdings is a Delaware corporation, with its principal place of business located in Illinois.

22. Defendant Colossus Management is a Delaware limited partnership, with its principal place of business located in Illinois.

23. Lancelot Investors Fund, LP ("Lancelot I"), one of the Debtors, was formerly known as Granite Investors Fund, L.P. and is a Delaware Limited Partnership, with its principal place of business in Northbrook, Illinois. Lancelot I was organized in September, 2001. LIM was the General Partner and Investment Manager of Lancelot I.

24. Lancelot Investors Fund II, LP ("Lancelot II"), another of the Debtors, is also a Delaware Limited Partnership, with its principal place of business in Northbrook, Illinois. Lancelot II was organized in February 2003. LIM was the General Partner and Investment Manager of Lancelot II.

25. Lancelot Investors Fund., Ltd. ("Offshore Lancelot"), another of the Debtors, was formerly known as Granite Investors Fund, Ltd. Offshore Lancelot was incorporated in 2002 in

the Cayman Islands, with its principal place of business in Northbrook, Illinois. LIM was the Investment Manager of Offshore Lancelot.

26. Petters is a citizen of Minnesota residing in Wayzata, Minnesota. Petters, through various entities, held a substantial ownership interest in numerous businesses, including Polaroid Corporation, Sun Country Airlines, catalog retailer Fingerhut, and magazine publisher Great Waters Media. Petters managed all of these businesses under the umbrella company Petters Group Worldwide, LLC, a Delaware limited liability company with its principal place of business in Minnetonka, Minnesota.

27. Other entities affiliated with Petters include: PCI, a Minnesota corporation with its principal place of business in Minnetonka, Minnesota; Edge One, LLC; MGC Finance Inc.; PAC Funding, LLC; PC Funding, LLC; PL Ltd., Inc.; and Thousand Lakes (collectively with Petters, the "Petters Entities").

28. Enchanted Family Buying Company was a shell company with no real operations. Petters represented to his lenders, including the Funds, that with Petters' financial assistance, Enchanted bought consumer electronics from suppliers and sold them to Retailers.

29. Like Enchanted, Nationwide International Resources was a shell company with no real operations. Petters represented to his lenders, including the Funds, that with Petters' financial assistance, NIR bought consumer electronics from suppliers and sold them to Retailers.

## BACKGROUND

### The Petters Ponzi Scheme

30. Beginning in approximately 1995, Petters and certain of the Petters Entities began raising money by offering and selling promissory notes to members of the public.

31. Petters offered and sold the notes to various feeder funds, which in turn raised their capital from hundreds of private lenders located throughout the United States and numerous

foreign countries. The Funds were among the many hedge funds to which the Petters Entities offered and sold notes over the years.

32.     In offering and selling notes, Petters represented to lenders and potential lenders that the proceeds from the sale of the notes would be used to finance so-called purchase order financing.

33.     Purchase order financing allows vendors to obtain immediate payment for goods that have been pre-sold to creditworthy retailers. Under Petters' version of purchase order financing, Petters and the Petters Entities arranged for the sale and delivery of end runs or overstock consumer electronics from manufacturers or suppliers to certain "Big Box" retailers such as Sam's Club, Costco, and Boscov's.

34.     Specifically, Petters represented that he worked with two companies, Enchanted and NIR, which bought the consumer electronics from suppliers and then resold the goods to Retailers.

35.     On information and belief, Petters represented that these transactions usually took up to 180 days to complete; according to Petters, while the suppliers demanded payment in advance, the Retailers would not pay until the merchandise was delivered. Thus, financing was necessary to bridge the period between when the suppliers demanded payment and when the Retailers paid for the merchandise.

36.     For each transaction, Petters and his accomplices provided a series of documents to their lenders. These documents included a funding request from PCI or its affiliates, executed note documents reflecting the loan and a guaranteed rate of return, purported purchase orders from a Retailer, purported bills of sale from the vendors, and documents assigning a security interest in the underlying merchandise to the financing lenders.

37. In fact, Petters' entire "purchase order financing" business was a multi-billion dollar Ponzi scheme.

38. There were no Retailers.

39. No one ordered any merchandise through PCI, its affiliates, Enchanted, or NIR.

40. Instead, Petters and his affiliates created fictitious invoices, purchase orders, and other documents, and used the money they had received from lenders to (a) make disbursements and other payments to earlier lenders, and (b) enrich themselves.

41. The two Vendors -- Enchanted and NIR -- were shell companies with no real operations. Indeed, the principals of the Vendors were associates of Petters. They knew there were no Retailers and no real orders to buy merchandise.

42. Each Vendor opened a bank account at the request of Petters. The Vendors deposited monies wired to them from lenders of Petters (including the Funds), took a percentage of that money as compensation for their role in the scheme, and returned the rest to Petters.

43. The principals of both Enchanted and NIR pleaded guilty in October 2008 to charges of conspiracy to commit money laundering.

**Petters and Bell Begin Their Relationship**

44. Until 2002, Bell worked for a hedge fund in Florida called Epsilon Investment Management, LLC ("Epsilon"). On information and belief, Petters approached Epsilon about lending money to Petters and his affiliates.

45. Before Bell permitted Epsilon to lend money to Petters, he caused Epsilon to hire Arthur Andersen to investigate Petters. After receiving Arthur Andersen's assurances that Petters was a legitimate company, Epsilon loaned money to Petters and/or PCI.

46.     While Bell was employed by Epsilon, Petters and Bell discussed the idea of Bell starting his own hedge fund and loaning money to Petters.

47.     Bell decided to pursue the idea and, while still employed by Epsilon, found seed financing from a pair of Chicago-area investors named Dan Asher and Thane Ritchie.

48.     Thereafter, Bell organized the predecessors to LIM, Lancelot I, and Offshore Lancelot, and made his first loans to Petters and PCI.

49.     In January 2003, Bell organized Lancelot II and continued to purchase PCI notes.

**Structure of the Funds**

50.     Before October 20, 2008, the date on which the Debtors filed for Chapter 7 protection in this Court, Bell controlled the Funds through his ownership of the Management Companies.

51.     Under applicable partnership and offering documents, the authority to make investment decisions on behalf of the Funds was delegated to Bell, through the Management Companies he created and managed.   In fact, Bell made most significant investment, management, and operational decisions for the Funds.

52.     Bell is the principal owner of the Management Companies, including the 100% interest owner in Lancelot Management, Inc., the general partner and sole manager of LIM and Colossus Management.

53.     LIM is the general partner of Lancelot I and Lancelot II, and the investment manager of Offshore Lancelot.   Together, Lancelot I, Lancelot II, and Offshore Lancelot comprise the "Lancelot Funds."

54.     Similarly, Colossus Management is the general partner of Colossus Capital Fund, L.P., and the investment manager of Colossus Capital Fund, Ltd. (together, the "Colossus Funds").

55.     Bell personally represented, either as the agent, director, manager, or partner, each of the Funds, the Management Companies, and various special purpose affiliates.

56.     As manager of LIM, for example, Bell was authorized to "manage the business of [LIM]" and had "all powers and rights necessary, appropriate, or advisable to effectuate and carry out the purposes and business of [LIM]."  (Ex. 1, Limited Liability Company Operating Agreement of Granite Investment Management, LLC, § 7(d).)

57.     To that end, Bell had "full, exclusive and complete discretion, power and authority . . . to manage, control, administer and operate the business and affairs of [LIM] . . . and to make all decisions affecting such business and affairs."  (*Id.* § 7(e).)

58.     In exercising those powers, Bell had numerous duties, including without limitation to "devote such time to the business and affairs of [LIM] as is necessary to carry out [his] duties" and to ensure that the business dealings and undertakings of [LIM] "shall be at arm's length and on commercially reasonable terms."  (*Id.* § 7(j)(i-ii).)

59.     As manager of LIM, Bell also had certain duties to the Funds.

60.     As general partner of Lancelot I, Bell (as manager of LIM) was solely authorized to manage, operate, and determine policy for the fund.  (*See, e.g.*, Ex. 2, Limited Partnership Agreement of Lancelot Investors Fund, § 7.1.)

61.     To that end, the Limited Partnership Agreement provided that Bell "shall have the authority and power on behalf and in the name of the Partnership to perform all acts and enter

62. In exercising that authority, Bell was obligated to:

use [his] best efforts in connection with the purposes and objectives of the Partnership and to devote to such purposes and objectives such of [sic] its time and activity (and the time and activity of its employees) during normal Business Days and hours as it in its discretion shall deem necessary for the management of the affairs of the Partnership . . . .

(*Id.* § 7.2(a).)

63. As manager of LIM, Bell had similar obligations to Lancelot II.

64. As manager of Colossus Management, Bell had similar obligations to Colossus Capital Fund, L.P.

65. The Memorandum and Articles of Association of Lancelot Investors Fund, Ltd. provides that the business of Offshore Lancelot "shall be managed by the Directors." (Ex. 3, Memorandum & Articles of Association of Granite Investors Fund, Ltd., ¶ 83.)

66. The Directors of the Offshore Lancelot Fund appointed Bell, the sole principal of LIM, as the fund's Investment Manager. The Investment Manager was responsible for "conducting all investment management operations of the [Offshore] Fund." (*See, e.g.*, Ex. 4, 2003 Offshore Lancelot CIM, at 1.)

67. As manager of Colossus Management, Bell had similar obligations to Colossus Capital Fund, Ltd.

68. Bell also had duties to each of the Funds created by operation of law.

69. Bell and LIM were investment advisers to the Lancelot Funds and owed the Lancelot Funds a fiduciary duty.

70.     Bell and Colossus Management were investment advisers to the Colossus Funds and owed the Colossus Funds a fiduciary duty.

71.     Moreover, as detailed below, the Confidential Information Memoranda ("CIMs") distributed to the Funds' investors contain express statements, promises, and representations as to how Bell, through the Management Companies, was required to operate the Funds. Specifically, the CIMs described the steps that Bell, through the Management Companies, was required to take to protect the Funds.

**The Confidential Information Memoranda**

72.     From 2001 to September 2008, Bell and the Management Companies raised more than $2.5 billion by selling interests in the Funds to hundreds of investors located throughout the United States and in several foreign countries.  The investors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds.

73.     To induce investments in the Funds, potential investors were given copies of CIMs.  As examples, the December 1, 2003 CIM for Offshore Lancelot (the "2003 Offshore Lancelot CIM") is attached as Exhibit 4.  The March, 1 2006 CIM for Offshore Lancelot (the "2006 Offshore Lancelot CIM") is attached as Exhibit 5.  The January 1, 2006 CIM for Lancelot I (the "2006 Lancelot I CIM") is attached as Exhibit 6.  The January 1, 2006 CIM for Lancelot II (the "2006 Lancelot II CIM"), is attached as Exhibit 7.

74.     According to the CIMs, the "principal investment strategy" to be employed by the Funds was Purchase Order Financing.  (*See, e.g.*, 2006 Lancelot I CIM, at 6.)  The vast majority of investments made by the Funds were purchases of Notes from Thousand Lakes.

75.     Generally, Lancelot I and Lancelot II purchased Notes directly from Thousand Lakes.  Offshore Lancelot purchased Notes from Lancelot I and Lancelot II that had been purchased initially from Thousand Lakes.

76.     The Notes were issued by Thousand Lakes ostensibly to finance the purchase of consumer electronics for resale to Retailers.

77.     The name of Thousand Lakes was not disclosed to investors in the Funds.  Instead, investors were told that (a) the Notes purchased by the Funds would evidence loans made to one or more independently controlled special purpose vehicles that engaged in the business of acquiring consumer electronics and selling such goods to the Retailers, and (b) the Funds could not disclose certain information, such as the name of the counter-party to the Notes, because that information was proprietary and maintaining the confidentiality of that information was in the best interests of the Funds.  Indeed, the CIMs refer to the Note sellers simply as the "SPVs."

78.     To induce investments, Bell distributed an "Executive Summary" to certain investors.  The Executive Summary contained a diagram called the Illustrative Transaction Flow Chart (the "Flow Chart").  The diagram represented the flow of funds in a Note purchase by the Funds from Thousand Lakes.  Specifically, the flow was to occur as follows:

- Lancelot would fund a Note after a binding agreement between the distributor (Nationwide or Enchanted) and the Retailer was in place.

- Lancelot would fund 80-90% of the deal into Thousand Lakes, while 10-20% of the deal would be funded by Petters or PCI.

- Thousand Lakes was supposed to transfer the money directly to the Vendors; no money would be transferred to PCI until the transaction was complete.

- The Retailer would remit funds directly to Thousand Lakes' account, which the Funds would solely control.

- The Funds would transfer the Vendor's share of the proceeds to the Vendor.

- Lancelot would carry credit insurance and property and casualty insurance.

79.    The Flow Chart is attached as Exhibit 8.

80.    In the CIMs and other Agreements, and in conversations with investors, Bell, through the Management Companies, represented that he had taken steps to protect the Debtors' assets.

81.    Consistent with the Executive Summary, Bell, through the Management Companies, explicitly agreed to "originate Notes based on the terms of the Note, the terms of the Purchase Order, the character of the Underlying Goods, the sufficiency of the collateral, the identity of the Retailer and the availability of credit insurance with respect to the Retailer." (2006 Lancelot I CIM, at 7.)

### Pre-existing, Binding Purchase Orders

82.    Bell, through the Management Companies, agreed to ensure that the Debtors would purchase Notes from Thousand Lakes *only* if there was a pre-existing, binding purchase order with a retailer.

83.    As an example, the 2006 Lancelot II CIM describes the security to be provided for the Notes in the following manner:

> The Fund will purchase Notes only in circumstances where the SPV has a pre-existing, binding agreement with a Retailer to sell the Underlying Goods to such Retailer on a future date (a "Purchase Order"). As a result of such Purchase Orders, the Fund will assume little or no inventory risk with respect to the Underlying Goods. In general, a Note purchased by the Fund will finance up to 80% of the sale price of the Underlying Goods purchased by the SPV in a particular transaction; however, the Fund reserves the right to purchase Notes that finance in excess of 80% of the sale price of the Underlying Goods and the receivables arising therefrom.  With respect to each Note purchased by the Fund, the Fund will require collateral generally equal to 120% of

15

> the value of the Note. The Fund will have a security interest in the
> Underlying Goods which will be protected through the use of a
> proof of encumbrance filing under Article 9 of the Uniform
> Commercial Code. In addition to its security interest in the
> Underlying Goods, each Note purchased by the Fund will be
> guaranteed by the SPVs principals and/or affiliates of the SPV.

(2006 Lancelot II CIM, at 6.)

### *Security in the Collateral*

84.    Bell, through the Management Companies, agreed to ensure that the Funds obtained collateral equal to 120% of the value of each Note purchased from Thousand Lakes. (*See, e.g.*, 2006 Offshore Lancelot CIM, at 7.) For notes prior to 2006, Bell, through the Management Companies, had agreed to ensure that the Funds obtained collateral equal to 150% of the value of each Note purchased from Thousand Lakes. (2003 Offshore Lancelot CIM, at 7.)

85.    Moreover, Bell, through the Management Companies, agreed to ensure that the Funds had a security interest in the Underlying Goods protected through the use of Proof of Encumbrance filed under Article 9 of the Uniform Commercial Code. (2006 Offshore Lancelot CIM, at 7.)

### *Guarantee*

86.    Bell, through the Management Companies, agreed to ensure that each Note purchased from Thousand Lakes was guaranteed by a valid, enforceable guarantee from Thousands Lakes' principals and/or its affiliates, including PCI. (*Id.*, at 7.)

### *Monitoring*

87.    Bell, through the Management Companies, undertook a duty to monitor all of transactions underlying the purchase order financing.

88. To satisfy those obligations, Bell was required to examine the purchase orders purportedly executed for the sale of Underlying Goods in order to understand Thousand Lakes' obligations thereunder.

89. Indeed, the CIMs specifically required that

> "[p]rior to purchasing a Note, the Investment Manager [or General Partner] will examine the Purchase Order for the sale of the particular Underlying Goods by the [Thousand Lakes] to the Retailer. The Investment Manager will select Notes to offer to the Fund for purchase based on the terms of the Note, the terms of the Purchase Order, the character of the Underlying Goods, the sufficiency of the collateral, the identity of the Retailer and the availability of credit insurance with respect to the Retailer."

(*Id.*)

90. Further, the CIMs required that

> "[a]fter a Note is purchased, an affiliate of the Fund or Investment Manager will monitor [Thousand Lakes] and the Retailer during the duration of the Note. In particular, [Thousand Lakes] will be monitored to confirm that [Thousand Lakes] satisfies its obligations under the Purchase Order including, without limitation, the delivery of the Underlying Goods to the Retailer, and the payment by the Retailer to [Thousand Lakes] of the purchase price of the Underlying Goods, all in accordance with the requirements set forth in the Purchase Order."

(*Id.*, at 8.)

### The Lock-Box

91. The CIMs stated that the Funds required a lock-box arrangement with Thousand Lakes that was intended to give the Funds control over Thousand Lakes' bank accounts:

> [I]n general the Funds will have a "lock-box" arrangement with the SPV, pursuant to which the Fund will have control over the SPV's bank account into which the Retailer will pay the purchase price for the Underlying Goods, which is designed to protect the Fund from the SPV using such proceeds for any other purpose prior to satisfying the SPV's obligations under the Note.

(*Id.* at 7.)

92.     The Retailers were to pay the purchase price for the Underlying Goods directly into the lock-box.  The Funds were then to be paid directly from the lock-box, with any residual funds sent to PCI.  Accordingly, at no time were the Funds to receive repayments directly from Petters or PCI.

**The Petters Scheme Is Exposed**

93.     On September 24, 2008, FBI agents raided Petters' home and a number of his businesses.  The search warrant authorizing the raid details a scheme by Petters and his co-conspirators to defraud investment funds and other entities that provided loans and financing to his companies.  On December 2, 2009, Petters was convicted on 20 criminal offenses, including mail and wire fraud, money laundering, and obstruction of justice.

94.     On July 10, 2009, FBI agents took Bell into custody after obtaining a warrant for his arrest to answer a criminal complaint against him.  According to the Hovey Affidavit, Bell engaged in a series of "round-trip" transactions in an effort to conceal Thousand Lakes' delinquencies.  The Hovey Affidavit further states that in 2008, Thousand Lakes ceased wiring money to NIR and Enchanted in contravention of the instructions on the Notes, and instead wired money directly to PCI.

95.     On October 7, 2009 Bell pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C § 1343.  A copy of the plea agreement is attached as Exhibit 9.

**Bell's Failure to Fulfill His Duties**

96.     Contrary to his obligations, undertakings, and/or representations, Bell, through the Management Companies, negligently failed to protect the Funds.

97.     Bell, through the Management Companies, failed to ensure that the Funds purchased Notes from Thousand Lakes only in circumstances where Thousand Lakes and/or the Vendors had a genuine, pre-existing, binding purchase order with a retailer.

98.     Bell, through the Management Companies, failed to monitor or confirm the delivery of Underlying Goods from the Vendors to the Retailers.

99.     Bell, through the Management Companies, failed to monitor Thousand Lakes, the Vendors, and the Retailers during the duration of the Notes purchased by the Funds from Thousand Lakes.

100.    Bell, through the Management Companies, failed to confirm payment by the Retailers of the purchase price for the Underlying Goods.

**The "Round-Trip" Transactions**

101.    Bell joined the Petters Ponzi scheme on or about February 26, 2008.

102.    On information and belief, in late 2007, a former PCI executive had a telephone conference with Lancelot executive Harold Katz in which Katz told the PCI executive that Lancelot wanted to wait until certain Costco invoices were "caught up" before Lancelot would send any new money.

103.    Also on information and belief, in early 2008, Bell told this same PCI executive that the Funds would wire money to the Petters Entities so that the executive "could pay invoices, and that the [executive] would pay the invoices and wire the money back to [the Funds]."

104.    To that end, starting in late February 2008, Bell caused the Funds to initiate at least 67 transactions where investor money was effectively used to satisfy Thousands Lakes' payment obligations to the Funds under various Notes.

105.    For each of these 67 transactions, the Funds wired money to PCI purportedly to purchase a Note from Thousand Lakes.  Then, within hours, PCI wired an almost identical amount of money to the Funds purportedly to satisfy obligations under an earlier note.

106.    Between February and April 2008, on each occasion when the Funds purchased a new Note from PCI, payments were made by PCI to the Funds in an amount similar to the new note amount.  For example, on February 26, 2008, Lancelot entered into an agreement with PCI to purchase a note for $17,000,000.  That same day, PCI remitted four payments to Lancelot totaling $17,045,051.25 purportedly to pay earlier notes.  On the following day, February 27, 2008, Lancelot purchased a new note for $20,000,000 from PCI.  PCI remitted four payments on the same day which totaled $20,224,990.

107.    Beginning in May 2008, some payments from PCI were sent on the same day and some were on the day following the issuance of a new note.  For example, on May 1, 2008, $20,400,000 was wired to PCI for a new note. On May 1, 2008, PCI wired $16,430,634 to Lancelot, and on May 2, $4,015,312.50 was wired to Lancelot.  The two incoming wires total $20,445,946.50.  Similarly on May 9, 2008, PCI was issued a $29,700,000 note.  Incoming funds from PCI to Lancelot on May 9 totaled $24,464,421.50.  A payment of $5,263,141.25 was made on May 12.  These two payments totaled $29,727,562.75.

108.    The last note was purchased on September 17, 2008, in the amount of $13,700,000.  Incoming funds from PCI to Lancelot that day totaled $13,796,271.60.

109.     During the period from February to September 2008, the total amount of cash that originated from Lancelot Investors LP to PCI on new notes was $1,377,050,000.   The total amount of cash received by Lancelot from PCI was $1,391,708,410.

**Payments to Insiders**

110.     Under the Limited Partnership and other agreements, Bell was compensated in two ways.   First, Bell's capital accounts were supposed to be allocated, on a quarterly basis, an amount equal to 20% of "New Investment Profits," (Limited Partnership Agreement of Lancelot Investors Fund, § 4.3(a)), which are defined as the "Investment Profits," or "the increase in the Net Asset Value" of the Funds reduced by any "deemed distributions or other deductions for such period," (*id.*, §1.21.), and any "Unrecouped Prior Losses."  (*Id.*, § 1.27.)  Second, Bell was to be compensated through the receipt of a quarterly management fee equal to 0.5% (2% annually) of the Funds' net asset value.  (*Id.*, §7.3(b).)

111.     According to the Debtors' pre-petition annual reports, from 2002 to January 5, 2008, the Funds paid at least $77,174,531 in management and performance fees to the Management Companies.   In addition, the Debtors accrued at least $104,149,254 in additional performance and management fees to the Management Companies.

112.     On February 13, 2008, Bell made a pair of identical transfers of $11,706,155 from an account he held jointly with his wife to the Gregory Bell Revocable Trust and the Inna Goldman Revocable Trust, respectively.   The approximately $23 million Bell transferred previously had been transferred into Bell's account from an LIM account and had been originally obtained from the Funds.

113.    Bell also improperly took money directly from the Funds.  On April 9 and 10, 2008, Gregory Bell transferred $5,682,996 from Lancelot I and Lancelot II to a personal account he held jointly with his wife, Inna Goldman.

114.    Bell also caused the Funds to make payments to various preferred insiders, including Thane Ritchie and Dan Asher.

## COUNT ONE
### Negligence (against all Defendants)

115.    The Trustee restates and realleges paragraphs 1-100 and 110-114 as though fully set forth herein.

116.    The Defendants owed the Funds a duty to act in good faith and a duty to exercise their business judgment in the best interests of the Funds, using reasonable diligence.

117.    The acts and omissions of the Defendants detailed in paragraphs 1-100 and 110-114, above, constitute negligence and a breach of duties owed by Defendants to the Funds.

118.    But for the acts and omissions of Defendants, the Funds could have avoided massive losses by revealing the Ponzi scheme orchestrated by Petters and the Petters Entities.

119.    Accordingly, Defendants injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT TWO
### Gross Negligence (against all Defendants)

120.    The Trustee restates and realleges paragraphs 101-109 as though fully set forth herein.

121.    Defendants owed the Funds a duty not to put their own interests above the interests of the Funds and the investors, a duty to act in good faith, and a duty to exercise their business judgment in the best interests of the Funds, using reasonable diligence.

122.     The acts and omissions of Defendants to concoct a series of "round-trip transactions," as detailed in paragraphs 101-109, constitute gross negligence and a breach of duties owed by Defendants to the Funds.

123.     But for the acts and omissions of Defendants, the Funds could have avoided massive losses by revealing the Ponzi scheme orchestrated by Petters and the Petters Entities.

124.     Accordingly, Defendants injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT THREE
### Breach of Fiduciary Duty (against Bell)

125.     The Trustee restates and realleges paragraphs 1-100 and 110-114 as though fully set forth herein.

126.     Bell, through the Management Companies, owed the Funds (i) a fiduciary duty; (ii) a duty not to put his own interests above the interests of the Funds and the investors; and (iii) a duty to act in good faith and to exercise his business judgment in the best interests of the Funds, using reasonable diligence.

127.     The acts and omissions of Bell detailed in paragraphs 1-100 and 110-114, above, constitute multiple breaches of Bell's fiduciary duties to the Funds.

128.     Accordingly, all management fees, performance allocations or other compensation of any kind paid or credited to Bell, through the Management Companies, should be forfeited and must be returned to the Funds.

129.     To the extent Bell has received any other distributions, dividends, withdrawals, salary, compensation or payments of any kind from the Funds, all such payments or compensation were received in connection with, and during the existence of, Bell's breach of his

fiduciary duties to the Funds. Accordingly, all such payments and compensation should be forfeited and must be returned to the Funds.

130.    Bell failed to conduct investigations required by ordinary prudence and which, if undertaken, could have avoided massive losses to the Funds by revealing the scheme orchestrated by Petters and his co-conspirators.

131.    Accordingly, Bell injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT FOUR
### Unjust Enrichment (against Bell)

132.    The Trustee restates and realleges paragraphs 1-100 and 110-114, as though fully set forth herein.

133.    Bell has unjustly enriched himself by receiving numerous distributions, dividends, withdrawals, salary, compensation and other payments from the Funds and/or the Management Companies.

134.    Bell has unjustly retained those benefits to the detriment of the Funds and their investors.  All such monies in the hands of Bell are due to be repaid to and for the benefit of the Funds.

135.    Bell's retention of the benefits violates the fundamental principles of justice, equity, and good conscience.

136.    The Trustee seeks to receive the value of the benefits Bell has unjustly retained in an amount to be determined at trial.

## COUNT FIVE

### Alternatively, Avoidance and Recovery of Preferences
### Pursuant to §§ 547(B) and 550(A) of the Bankruptcy Code (against all Defendants)

137.    Count Five is alleged in the alternative to Counts I-IV.  The Trustee restates and realleges paragraphs 1 through 114, as though fully set forth herein.

138.    On or within 365 days prior to October 20, 2008, Debtors transferred to Defendants an amount to be determined at trial.

139.    Each such transfer was made for the benefit of the Defendants.

140.    The Defendants were insiders.

141.    Each such transfer was made on account of an antecedent debt owing from Debtors to Defendants.

142.    Each such transfer was made while Debtors were insolvent.

143.    Each such transfer enabled Defendants to receive more than they would have received if that transfer had not been made, and if Defendants had received payment of the debt underlying that transfer to the extent provided by the provisions of the Bankruptcy Code.

144.    Pursuant to 11 U.S.C. § 547(b), the Trustee is entitled to avoid each such transfer.

145.    Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover each such transfer, or the value thereof, avoided by this Count.

## COUNT SIX

### Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant To
### §§ 548(A)(1)(B) And 550(A) Of The Bankruptcy Code (against all Defendants)

146.    The Trustee restates and realleges paragraphs 1 through 114 of this Complaint as though fully set forth herein.

147. On or within two years prior to October 20, 2008, the Debtors transferred more than $68 million to or for the benefit of Defendants. A schedule of those transfers is attached as Exhibit 10.

148. Each transfer constituted a transfer of an interest of the Debtor in property.

149. On the date of each transfer, Debtors received less than a reasonably equivalent value in exchange for the transfer.

150. At the time of each Transfer, Debtors: (a) were insolvent or became insolvent as a result of the Transfer; (b) were engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (c) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

151. Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to avoid any transfers made to or for the benefit of Bell and/or LIM during the two years prior to the petition date.

152. Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover any such transfers, or the value thereof, avoided pursuant to this Count.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court grant him the following relief against Defendants:

A. Award damages in an amount to be determined at trial but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

B. Order Defendants to disgorge and return to Debtors all fees, compensation, performance allocations, or any other payments of any kind received directly or indirectly from the Funds since their inception.

C.      Award such other relief as the Court deems appropriate and just.

Dated:  December 7, 2009

Ronald R. Peterson
Terri L. Mascherin
Sarah Hardgrove-Koleno
Jason J. Green
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654-3456
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484

*Counsel for Chapter 7 Trustee*

Respectfully submitted,

RONALD R. PETERSON, not
individually but as Chapter 7
Trustee for Lancelot Investors
Fund, L.P., *et al.*

By: /s/ *Ronald R. Peterson*

One of His Attorneys

Case 1:04-cv-02634-Document #: 15-1 Filed 04/13/04 Page 20 of 126 PageID #71
Case 1:04-cv-02634-Document #: 15-1 Filed 04/13/04 Page 20 of 126 Desc Exhibit D
Page 1 of 31

# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| LANCELOT INVESTORS FUND, L.P., *et al.* | ) Case No. 08-28225, *et al.* |
| | ) (Jointly Administered) |
| Debtor. | ) |
| | ) Hon. Jacqueline P. Cox Presiding |
| _____ | ) |
| | ) |
| RONALD R. PETERSON, as Chapter 7 Trustee | ) |
| for Lancelot Investors Fund, L.P., *et al.*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. No. _____ |
| | ) |
| SWISS FINANCIAL SERVICES (BAHAMAS), | ) |
| LTD., and SWISS FINANCIAL SERVICES, | ) |
| INC., | ) |
| | ) |
| Defendants. | |

## COMPLAINT

Ronald R. Peterson (the "Trustee"), not individually, but as the Chapter 7 Trustee for the

estate of Lancelot Investors Fund, L.P., *et al.* (the "Debtors"), hereby complains as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding by the Trustee against Swiss Financial Services,

Inc. ("SFS USA") and Swiss Financial Services (Bahamas) ("SFS Bahamas") (collectively,

"Defendants" or "Swiss Financial") on behalf of five hedge fund Debtors – Lancelot Investors

Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors Fund, Ltd., Colossus Capital

Fund, L.P., and Colossus Capital Fund, Ltd. (together the "Funds").

2.      Prior to October 20, 2008, the date on which the Funds and their affiliated debtors

filed for Chapter 7 protection in this Court, the Funds were controlled by an Illinois resident,

Greg Bell ("Bell"), through various levels of management companies set up by Bell. Under applicable limited partnership and other agreements, the authority to make certain investment decisions on behalf of the Funds was delegated to Bell, through management companies controlled by Bell.

3.      As of October 20, 2008, the pre-petition Debtors reported assets with a book value of $1.8 billion.  Those assets were comprised predominantly of notes (the "Notes") purchased from a special purpose vehicle, Thousand Lakes, LLC ("Thousand Lakes"), which was controlled by and affiliated with Thomas J. Petters ("Petters") and Petters Company International ("PCI").  The Notes were purportedly secured by certain goods and merchandise owned by Thousand Lakes and/or certain vendors, Enchanted Family Buying Company ("Enchanted") or Nationwide International Resources ("NIR" and together the "Vendors").

4.      Bell and his management companies, through their own special purpose entity, RWB Services ("RWB"), served as commercial lenders to PCI by purchasing Notes from Thousand Lakes.  The Notes were issued by Thousand Lakes ostensibly to finance the purchase of consumer electronics and other so-called "brown goods" for resale to major retailers such as Sam's Club, Costco, Boscov's, and others (the "Retailers").  In fact, the Notes were issued in connection with a multi-billion dollar Ponzi scheme orchestrated by Petters and his co-conspirators.

5.      As part of the alleged scheme, Petters and his co-conspirators created fictitious invoices, purchase orders, and other documents, and used the money they had received from investors to (a) make disbursements and other payments to earlier investors, and (b) enrich themselves.

2

6. The goods and merchandise in which the Funds purportedly held a perfected security interest never existed and certain pre-existing, purportedly binding purchase orders allegedly provided to Bell and the Funds are forgeries. Accordingly, the Notes held by the Funds are worthless and the collateral allegedly pledged to the Funds as security for the Notes is nonexistent.

7. SFS USA and SFS Bahamas were retained by the Funds to perform various accounting, administrative, and shareholder services necessary for the successful operation of the Funds. Among other things, Defendants agreed to calculate the Net Asset Value ("NAV") of the Funds on a monthly basis and to provide monthly and year-end financial statements that accurately and fairly represented the financial condition of the Funds.

8. In deciding to retain SFS USA and SFS Bahamas, the Funds relied on Defendants' reputation as industry professionals with the necessary skill, expertise, and knowledge to perform their duties, including the calculation of NAV of the Funds and the provision of financial statements that presented the financial condition of the Funds accurately and fairly in all material respects.

9. Indeed, according to the website of the Swiss Financial Group of Companies, an umbrella group that includes SFS USA and SFS Bahamas, Swiss Financial is a "fund administration specialist, serving the administration and accounting needs of U.S. and offshore investment funds" that "provide[s] competent and timely accounting and administration to alternative investment products."

10. Because the Funds' primary investment strategy was to purchase Notes from Petters and his affiliates, SFS USA and SFS Bahamas were required to assess the risk of non-payment of the Notes in order to value the Funds' assets properly.

11.     Moreover, SFS USA and SFS Bahamas were required to assess the efficacy of other risk mitigation strategies employed by the Funds, including the value of the collateral underlying the Notes, the existence and scope of credit insurance held by the Funds, and the existence and efficacy of certain safeguards used by the Funds.

12.     Contrary to its obligations and duties, Defendants failed to conduct even rudimentary investigations to verify the legitimacy of the activities of Thousand Lakes, Petters, and PCI, to confirm the existence, operation, and efficacy of certain safeguards used by the Funds to manage risk, and to confirm the existence and scope of credit insurance held by the Funds.

13.     As a result of the breaches of duty and other failures by SFS USA and SFS Bahamas, the Funds continued to purchase hundreds of millions of dollars in Notes from Petters and his affiliates.

14.     Had Defendants properly performed their duties as Administrators of the Lancelot Funds, the Funds would not have fallen victim to Petters' fraudulent scheme and would not have lost their investments in Thousand Lakes.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and (e) because this adversary proceeding arises in, is related to, and arises under the Chapter 7 case, *In re Lancelot Investors Fund, L.P., et al.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, jointly administered as Case No. 08-28225.

16.     Counts VI and VII of this Complaint are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(F) and (H).  All other counts are non-core.

17.     This Court has personal jurisdiction over SFS Bahamas pursuant to 735 ILCS 5/2-209 because SFS Bahamas transacted business within Illinois, committed tortious acts within Illinois, and breached fiduciary duties within Illinois.

18.     This Court has personal jurisdiction over SFS USA pursuant to 735 ILCS 5/2-209(a) because, among other things, Swiss Financial is incorporated in Illinois, is doing business within Illinois, entered into and breached contractual obligations with the Funds in Illinois, and committed tortious acts within Illinois.

19.     Venue is proper is this District pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES AND RELATED ENTITIES

20.     Defendant SFS Bahamas is a Bahamian limited liability company, with its principal place of business in Nassau, the Bahamas.  SFS Bahamas is a subsidiary of Swiss Financial Holdings AG (Switzerland).  SFS Bahamas served as Administrator to Lancelot Investors Fund, Ltd.

21.     Defendant SFS USA is a Delaware corporation, with its principal place of business in Naperville, Illinois.  SFS USA is a wholly-owned subsidiary of Swiss Financial Holdings, AG (Switzerland).  SFS USA served as Administrator to Lancelot Investors Fund, L.P. and Lancelot Investors Fund II, L.P., and, as a subcontractor to Swiss Financial Bahamas, performed certain accounting functions for Lancelot Investors Fund, Ltd., including calculation of NAV and NAV per share.

22.     Plaintiff Ronald R. Peterson is the qualified Chapter 7 trustee for the Debtors, duly appointed under 11 U.S.C. § 701(a)(1) of the United States Bankruptcy Code by Orders of this Court dated October 20, 2008.

23.     The Debtors consist of 19 related entities engaged in the operation of related hedge funds or special purpose vehicles.  As set forth in the following chart, each of the Debtors

was ultimately controlled by Bell, through various levels of management companies set up by

Bell.



24.     Bell is a citizen of the State of Illinois, residing in Highland Park.  Bell is the

principal owner of the Management Companies, defined below.  Bell personally represented,

either as the agent, director, manager, or partner, each of the Funds, the Management Companies,

and various affiliates.

25.     Lancelot  Management,  Inc.,  Lancelot  Holdings,  LP,  Lancelot  Investment

Management LP (f/k/a Lancelot Investment Management, LLC) ("LIM") and Colossus Capital

Management,  LP,  through  which  Bell  managed  and  controlled  the  Funds,  are  referred  to

collectively herein as the "Management Companies."

26.     Lancelot Investors Fund, LP ("Lancelot I"), one of the Debtors, is formerly known as Granite Investors Fund, L.P. and is a Delaware Limited Partnership, with its principal place of business in Northbrook, Illinois.  Lancelot I was organized in September 2001.  LIM was the General Partner and Investment Manager of Lancelot I.

27.     Lancelot Investors Fund II, LP ("Lancelot II"), another of the Debtors, is also a Delaware Limited Partnership, with its principal place of business in Northbrook, Illinois. Lancelot II was organized in February 2003.  LIM was the General Partner and Investment Manager of Lancelot II.  Lancelot I and Lancelot II are the "Onshore Funds."

28.     Lancelot Investors Fund., Ltd. ("Offshore Lancelot" or the "Offshore Fund") is a hedge fund incorporated in 2002 in the Cayman Islands, with its principal place of business in Northbrook, Illinois.  LIM was the Investment Manager of Offshore Lancelot.

## FACTS

### The Petters Ponzi Scheme

29.     Beginning in approximately 1995, Petters and certain of the Petters Entities began raising money by offering and selling promissory notes to members of the public.

30.     Petters offered and sold the notes to various feeder funds, which in turn raised their capital from hundreds of private investors located throughout the United States and numerous foreign countries.  The Funds were among the many hedge funds to which the Petters Entities offered and sold notes over the years.

31.     In offering and selling notes, Petters represented to lenders and potential lenders that the proceeds from the sale of the notes would be used to finance so-called purchase order financing.

32.     Purchase order financing allows vendors to obtain immediate payment for goods that have been pre-sold to creditworthy retailers.  Under Petters' version of purchase order

7

financing, Petters and the Petters Entities arranged for the sale and delivery of end runs or overstock consumer electronics from manufacturers or suppliers to certain "Big Box" retailers such as Sam's Club, Costco, and Boscov's.

33.     Specifically, Petters represented that he worked with two companies, Enchanted and NIR, which bought the consumer electronics from suppliers and then resold the goods to the Retailers.

34.     On information and belief, Petters represented that these transactions usually took up to 180 days to complete; according to Petters, while the suppliers demanded payment in advance, the Retailers would not pay until the merchandise was delivered.  Thus, financing was necessary to bridge the period between when the suppliers demanded payment and when the Retailers paid for the merchandise.

35.     For each transaction, Petters and his accomplices provided a series of documents to their lenders.  These documents included a funding request from PCI or its affiliates, executed Note documents reflecting the loan and a guaranteed rate of return, purported purchase orders from a Retailer, purported bills of sale from the vendors, and documents assigning a security interest in the underlying merchandise to the financing lenders.

36.     In fact, Petters' entire "purchase order financing" business was a multi-billion dollar Ponzi scheme.  There were no Retailers.  No one ordered any merchandise through Petters, PCI, Enchanted, or NIR.  Instead, Petters and his affiliates created fictitious invoices, purchase orders, and other documents, and used the money they had received from lenders to (a) make disbursements and other payments to earlier lenders, and (b) enrich themselves.

37. The two Vendors -- Enchanted and NIR -- were shell companies with no real operations. Indeed, the principals of the Vendors were associates of Petters. They knew there were no Retailers and no real orders to buy merchandise.

38. Each Vendor opened a bank account at the request of Petters. The Vendors deposited monies wired to them from lenders of Petters (including the Funds), took a percentage of that money as compensation for their role in the scheme, and returned the rest to Petters.

**The Funds' Relationship with Petters**

39. In 2001, Bell organized the predecessors to LIM, Lancelot I, and Offshore Lancelot and made his first loans to Petters and PCI.

40. In January 2003, Bell organized Lancelot II and continued to purchase PCI Notes.

41. From 2001 to September 2008, Bell and the Management Companies raised more than $2.5 billion by selling interests in the Funds to hundreds of investors located throughout the United States, including in Illinois, and in several foreign countries. The investors included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds.

42. The principal investment strategy employed by the Funds was Purchase Order Financing with Petters. The vast majority of investments made by the Funds were purchases of Notes from Thousand Lakes.

43. Generally, Lancelot I and Lancelot II purchased Notes directly from Thousand Lakes. Offshore Lancelot purchased Notes from Lancelot I and Lancelot II that had been purchased initially from Thousand Lakes.

44. To induce investments in the Funds, potential investors were given copies of CIMs. As examples, the December 1, 2003 CIM for Offshore Lancelot (the "2003 Offshore

Lancelot CIM") is attached as Exhibit 1. The March, 1 2006 CIM for Offshore Lancelot (the "2006 Offshore Lancelot CIM") is attached as Exhibit 2. The January 1, 2006 CIM for Lancelot I (the "2006 Lancelot I CIM") is attached as Exhibit 3. The January 1, 2006 CIM for Lancelot II (the "2006 Lancelot II CIM"), is attached as Exhibit 4.

45.     SFS USA and SFS Bahamas were also provided with a copy of the CIMs and, pursuant to agreements with the Funds, were obligated to comply with certain obligations described in the CIMs.

46.     For example, the CIMs stated that SFS USA and SFS Bahamas performed financial services for the Funds. SFS USA was the Administrator of the Onshore Fund. SFS was the Administrator of the Offshore Fund. In particular, the CIMs represented that SFS USA and SFS Bahamas calculated the Funds' Net Asset Value according to generally accepted accounting principles ("GAAP") on a monthly basis. (*See, e.g.*, 2003 Offshore Lancelot CIM, at 20; 2006 Offshore Lancelot CIM, at 23-24.)

47.     The CIMs also expressly disclosed how NAV was to be calculated. For example, the CIMs for the Offshore Fund provided:

> **NET ASSET VALUATIONS**
>
> The "Net Asset Value of the Fund" and the calculation of Share NAV is determined by or at the direction of the Administrator as of the end of each fiscal month and on such other dates as the Administrator shall determine, in U.S. Dollars based upon information provided by the Investment Manager.
>
> The "Net Asset Value of the Fund" as of any calculation date equals the total assets of the Fund, less its total liabilities (including accrued liabilities, irrespective of whether such liabilities may in fact ever be paid), determined in accordance with GAAP except as described herein. The Share NAV as of any calculation date will be calculated by dividing the Net Asset Value of the Fund by the number of issued Shares as of the close of business on such calculation date.
>
> The Investment Manager is responsible for reporting its portfolio valuations to the Administrator, who is required to assign such valuations to the Fund's portfolio

investments for the purposes of determining the Fund's Net Asset Value and
Share NAV.

Notes will be carried at fair value, which generally is equal to their principal
amount, plus any accrued interest, unless the Investment Manager determines in
good faith (in consultation with the Administrator) that some other value for a
Note is appropriate.

. . . .

Net Asset Value determinations reflect the deduction of all accrued debts and
liabilities of the Fund, including provisions for accounting, audit, legal and other
operating expenses as well as any contingencies for which reserves are
determined to be required. The Share NAV as of any date reflects an accrual
equal to any Performance Fee that would have been payable to the Investment
Manager if the Dealing Day (as defined below) were the close of a Performance
Fee calculation period.

Prospective investors should be aware that situations involving uncertainties as to
the valuation of portfolio positions could have an adverse effect on the Fund's Net
Asset Value if the Investment Manager's judgments regarding appropriate
valuations should prove incorrect. In the absence of bad faith or manifest error,
the Administrator's net asset value determinations are conclusive and binding on
all Shareholders.

The Investment Manager may instruct the Administrator to establish such reserves
for contingencies as the Investment Manager may, in its sole discretion, deem to
be appropriate.

The Administrator, at the direction of the Board of Directors, is authorized to
make all necessary adjustments to the foregoing calculation of Share NAV if the
Board of Directors determines that such adjustments are necessary and equitable
to permit the Fund to effectuate the foregoing policies regarding Share NAV
calculations.

(2003 Offshore Lancelot CIM, at 20-21; 2006 Offshore Lancelot CIM, at 23-24.)

48. In addition to the express representations regarding the calculation of the Funds'

NAV, the CIMs disclosed a number of safeguards that were ostensibly intended to protect the

value of the Funds' primary asset, Notes purchased from Petters.

49.    First, the CIMs represented that the Debtors would purchase Notes from Thousand Lakes *only* if there was a pre-existing, binding purchase order with a Retailer.  (*See, e.g.*, 2006 Offshore Lancelot CIM, at 6.)

50.    Second, the CIMs represented that the Funds would obtain collateral equal to 120% of the value of each Note.  (*See, e.g.*, 2006 Offshore Lancelot CIM, at 7.)  For notes prior to 2006, the CIMs represented that the Funds would obtain collateral equal to 150% of the value of each Note.  (2003 Offshore Lancelot CIM, at 7.)

51.    Third, the CIMs represented the Funds would have a security interest in the Underlying Goods protected through the use of a Proof of Encumbrance filed under Article 9 of the Uniform Commercial Code.  (Offshore Lancelot CIM, Mar. 2006, at 7.)

52.    Fourth, the CIMs stated that the Funds required a lock-box arrangement with Thousand Lakes that was intended to give the Funds control over Thousand Lake's bank accounts:

> [I]n general the Funds will have a "lock-box" arrangement with the SPV, pursuant to which the Fund will have control over the SPV's bank account into which the Retailer will pay the purchase price for the Underlying Goods, which is designed to protect the Fund from the SPV using such proceeds for any other purpose prior to satisfying the SPV's obligations under the Note.

(*Id.* at 7.)

53.    Fifth, the CIMs stated that the Funds would only purchase Notes where the SPV had purchased credit insurance with respect to a particular Retailer and named the Funds as "loss payee" on the insurance policy.  (*Id.*)

54.    Notwithstanding the safeguards described in the CIMs, the CIMs disclosed that an investment in the Funds included risks, including without limitation:

> a.    Market Risks – "There can be no assurance that what is perceived as an investment opportunity will not, in fact, result in losses as a result of one

or more of a wide variety of factors. The Fund can only be successful if the General Partner is able to invest successfully . . . and there can be no assurance that this will be the case." (*Id.* at 13.)

b.    Limited Investment Focus – "The Fund's investment activities will focus almost exclusively on investment in Notes. Given the Fund's relatively narrow investment focus, an investment in the Fund should not be considered a complete investment program for any investor's assets. Prospective investors should view an investment in the Fund as one component of their investment program." (*Id.*)

c.    Investments in Notes – The Notes held by the Fund will be subject to various risks, such as credit risk, fraud risk, and liquidity risk.

    i.    "Credit risk relates to the ability of the issuer of a security to make interest and principal payments on the security as they become due." (*Id.*)

    ii.    Fraud risk related to "[a] fraud by the issuer of the Note or an adverse event related to the issuer of a Note [which] can reduce or eliminate the value of such Note." (*Id.*)

    iii.    Liquidity risk relates to the fact that "the Notes are an illiquid investment for which there is no established resale market." (*Id.*)

d.    Retail Risk – "The SPV's dealings with Retailers present a variety of material risks to the Fund . . . ." For example, "[t]he SPV's ability to make principal and interest payments on the Note may depend on the Retailer's payment to the SPV of the purchase price for the Underlying Goods. If a Retailer defaults on its payment obligations to the SPV, such default may cause the SPV to default on its payment obligations under the Note, which may result in material losses to the Fund." (*Id.* at 14.)

e.    SPV Risks – Initially, "all Notes purchased by the Fund will be issued by a single SPV and, in such event, all Notes held by the Fund will be exposed to credit risk with respect to such SPV." (*Id.*)

**SFS USA's Duties as**
**Administrator for the Onshore Funds**

55. Consistent with CIMs, Lancelot I and Lancelot II retained SFS USA as Administrator of the Onshore Funds. SFS USA was obligated to perform its services with care and skill.

56. Pursuant to a 2002 Administrative and Accounting Services Agreement with Lancelot I and a 2003 Administrative and Accounting Services Agreement with Lancelot II, SFS USA had primary responsibility for the accounting and administrative functions of the Onshore Funds. The agreements are identical in all material ways and are referred to collectively as the "SFS USA Agreements."

57. Section 3.2 of the SFS USA Agreements set forth certain of SFS USA's responsibilities to the Onshore Funds, including:

> (f) Calculate the NAV of the Fund on a monthly basis, in accordance with generally accepted accounting principles in the United States. However, in doing so, the Administrator shall rely on the valuations of the Fund's portfolio as provided by the Fund's broker or custodian;
>
> (g) Prepare financial statements, general ledgers and account analysis of the Fund, maintain the accounts of the Fund and such books and records as are required by law in a manner consistent with good administration practice for the proper conduct of the Fund's affairs;
>
> . . . .
>
> (j) Coordinate the Fund's annual audit;

(Ex. 5, 2002 Administrative and Accounting Services Agreement with Lancelot I, § 3.2; Ex. 6, 2003 Administrative and Accounting Services Agreement with Lancelot II, § 3.2.)

58. The Onshore Funds had no broker or custodian.

59. On information and belief, SFS USA was never provided with "valuations" of the Onshore Funds' portfolio.

60. The SFS USA Agreements also provide that in the event of any conflict between the SFS USA Agreements and the CIMs, the CIMs shall control. (2002 Administrative and Accounting Services Agreement with Lancelot I, § 18; 2003 Administrative and Accounting Services Agreement with Lancelot II, § 18.) Accordingly, SFS USA was obligated to comply with all representations in the CIMs regarding SFS USA's obligations, including the method of calculating NAV described therein.

61. SFS USA also undertook obligations in communications with agents of the Onshore Funds and their investors. Among other things, SFS USA represented that in calculating the monthly NAV of the Onshore Funds and in compiling monthly and year-end financial statements, SFS USA would comply with generally accepted accounting principles ("GAAP"). SFS USA also represented that it would independently value the assets of the Onshore Funds, including whether the face value of those assets should be impaired.

62. GAAP requires fair valuation of financial instruments, including notes.

63. To that end, the Statement of Financial Accounting Standards, No. 107, provides in pertinent part:

> 5. [T]he fair value of a financial instrument is the amount at which the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale. . . .
>
> . . . .
>
> 11. Quoted market prices, if available, are the best evidence of the fair value of financial instruments. ***If quoted market prices are not available, management's best estimate of fair value may be based on the quoted market price of a financial instrument with similar characteristics or on valuation techniques*** (***for example, the present value of estimated future cash flows using a discount rate commensurate with the risks involved***, option pricing models, or matrix pricing models). . . .
>
> . . . .

15

14. If it is not practicable for an entity to estimate the fair value of a financial instrument or a class of financial instruments, the following shall be disclosed:

a. Information pertinent to estimating the fair value of that financial instrument or class of financial instruments, such as the carrying amount, effective interest rate, and maturity

b. The reasons why it is not practicable to estimate fair value.

(Ex. 7, emphasis added.)

64.     To comply with GAAP, in preparing the Onshore Funds' monthly NAV and financial statements, SFS USA was required to assess the risk of nonpayment of Notes purchased from Thousand Lakes and to appropriately discount or impair the value of those assets.

65.     To that end, SFS USA was obligated to assess the efficacy of the safeguards disclosed in the CIMs, including, without limitation, the existence of legitimate purchase orders, the existence and scope of the collateral, the existence and scope of credit insurance, and the existence of the lock box.

**SFS Bahamas' Duties as**
**Administrator for the Offshore Fund**

66.     Consistent with the CIMs, the Offshore Fund retained SFS Bahamas as Administrator of the Offshore Fund.  SFS Bahamas was obligated to perform its services with care and skill.

67.     Pursuant to a 2002 Administrative Services Agreement between SFS Bahamas and Offshore Lancelot's predecessor, Granite Investors Fund, Ltd. (the "SFS Bahamas Agreement"), SFS Bahamas was primarily responsible for the accounting and administrative functions of the Offshore Fund.

68.     Section 3.2 of the SFS Bahamas Agreement sets forth certain of SFS Bahamas' responsibilities, including:

    (n)      calculate the Net Asset Value and Net Asset Value per Share of each class of Shares of the Company on a monthly basis, or on a more frequent basis, including daily, if requested to do so by the Company, in accordance with international accounting standards; however in doing so, the Administrator shall rely on the valuations of the Company's portfolio as provided by the Company's custodian, broker or investment manager;

    (o)      prepare financial statements, general ledgers and account analysis of the Company, maintain the accounts of the Company and such books and records as are required by law in a manner consistent with good administration practice for the proper conduct of the Company's affairs; however, in doing so, the Administrator shall rely on the valuations of the Company's portfolio as provided by the Company's broker, custodian or investment manager;

. . . .

    (r)      coordinate the Company's annual audit;

. . . .

    (t)      coordinate the day to day administration of the Company with the Company's investment manager and the Board and deal with and respond to all correspondence and communications received by it relating to the Company and its affairs;

. . . .

    (v)      subject to the prior approval of the Company, the Administrator may delegate or assign any of the duties and functions it is required to perform under this agreement to any other person(s), firm(s) or corporation(s);

    (w)      provide the services of one or more directors of the Company in the Bahamas.

(Ex. 8, § 3.2.)

    69.    The Offshore Fund had no broker or custodian.

    70.    On information and belief, SFS USA and SFS Bahamas were never provided with "valuations" of the Offshore Fund's portfolio.

    71.    The SFS Bahamas Agreement also provides that in the event of any conflict between the SFS Bahamas Agreement and the CIMs, the CIMs shall control. (*Id.*, § 18.) Accordingly, SFS Bahamas was obligated to comply with all representations in the CIMs regarding SFS Bahamas' obligations, including the method of calculating NAV.

72.     SFS Bahamas subcontracted its obligation to calculate the NAV of the Offshore Fund to SFS USA.  The Offshore Fund is an intended third-party beneficiary of the subcontract between SFS Bahamas and SFS USA.

73.     SFS Bahamas and SFS USA also undertook obligations in communications with agents of the Offshore Fund and its investors.  Among other things, SFS Bahamas and SFS USA represented that in calculating the monthly NAV of the Offshore Fund and in compiling monthly and year-end financial statements, SFS Bahamas and SFS USA would comply with GAAP.  SFS Bahamas and SFS USA also represented that they would independently value the assets of the Onshore Fund, including whether the face value of those assets should be impaired.

74.     According to Swiss Financial, for purposes of calculating the NAV of the Offshore Fund and in compiling monthly and year-end financial statements, there is no material difference between GAAP and international accounting standards.

75.     Accordingly, in preparing the Offshore Fund's monthly NAV and financial statements, SFS Bahamas and SFS USA were required to assess the risk of nonpayment of Notes originally purchased from Thousand Lakes, and to appropriately discount or impair the value of those assets.

**The Petters Scheme Is Exposed**

76.     On September 24, 2008, FBI agents raided Petters' home and a number of his businesses.  On December 2, 2009, Petters was convicted on 20 criminal offenses, including mail and wire fraud, money laundering, and obstruction of justice.

77.     On July 10, 2009, FBI agents took Bell into custody after obtaining a warrant for his arrest to answer a criminal complaint against him.

78.     On October 7, 2009 Bell pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C § 1343.

## Swiss Financial's Acts and Omissions

79.     Contrary to their duties and obligations, SFS USA and SFS Bahamas (through its subcontractor, SFS USA) failed to calculate the Net Asset Value of the Funds fairly and accurately.

80.     In performing its valuations, SFS USA failed to conduct even rudimentary investigations to verify the legitimacy of the activities of Thousand Lakes, Petters, and PCI, or to confirm the validity of the collateral, security interests, and guarantees that were supposed to be obtained as security for repayment of the Notes.

81.     SFS USA and SFS Bahamas also failed to verify the existence, operation, and adequacy of the other safeguards described in the CIMs.

82.     In calculating the Net Asset Value of the Funds and in preparing their financial statements, SFS USA and SFS Bahamas did nothing to confirm that Notes held by the Funds were purchased only if there were authentic, pre-existing, binding purchase orders.

83.     In calculating the Net Asset Value of the Funds and in preparing their financial statements, SFS USA and SFS Bahamas did nothing to confirm the existence of any collateral securing the Notes held by the Funds.

84.     In calculating the Net Asset Value of the Funds and in preparing their financial statements, SFS USA and SFS Bahamas did nothing to confirm the existence and use of the lock-box arrangement.

85. In calculating the Net Asset Value of the Funds and in preparing their financial statements, SFS USA and SFS Bahamas did nothing to confirm the existence or scope of credit insurance policies held by Thousand Lakes on behalf of the Funds.

86. SFS USA and SFS Bahamas were in a unique position to verify the existence and operation of the safeguards, because four employees of SFS Bahamas, Vincent King, Benjamin Miller, Trevor Sunderland, and Thomas DeMaio, served as directors of the Offshore Fund between 2003 and 2008. Further, one of SFS Bahamas' employees, Thomas DeMaio, served as the Loan Acquisition Officer for the Offshore Fund. These individuals were privy to confidential, nonpublic information due to their positions.

87. Even absent confidential information, the CIMs explicitly disclosed the safeguards that had been put in place to protect the value of the Funds' primary asset. Yet, SFS USA and SFS Bahamas did nothing to confirm the adequacy or authenticity of those safeguards.

88. SFS USA and SFS Bahamas also failed to staff the engagement with competent professionals. Although SFS USA and SFS Bahamas were obligated to comply with GAAP and/or international accounting standards, the employee who served as "fund accountant" to the Funds, Karl Benzinger, is not an accountant. Nor is Mr. Benzinger's supervisor, Dan Walsh, an accountant. Indeed, no one involved in SFS USA's calculation of NAV for the Funds was an accountant.

89. In providing monthly and year-end financial statements, SFS USA and SFS Bahamas similarly failed to fulfill their duties and obligations to the Funds.

90. SFS USA and SFS Bahamas failed to recognize clear indicia of the fraudulent scheme perpetrated by Petters. Had SFS USA and SFS Bahamas adequately performed their duties and responsibilities, they would have discovered the Petters fraud.

**Swiss Financial's Compensation**

91.     Under the SFS USA Agreements and the SFS Bahamas Agreement, Defendants' fees were based on the value of the Funds' assets.  In other words, the greater the Net Asset Value of the Funds, the greater the compensation Defendants received.

92.     SFS USA and SFS Bahamas thus had a financial incentive not to impair the value of any of the Notes owned by the Funds, but instead to ignore the risk that the Funds would not collect all principal and interest owed under the Notes.

93.     In the two years immediately preceding the date on which the Funds declared bankruptcy, Defendants were paid $998,673.

## COUNT ONE
### Breach of Contract
(Against SFS USA)

94.     The Trustee restates and realleges paragraphs 1 through 93 as though fully set forth herein.

95.     Lancelot I and SFS USA were parties to an Administrative and Accounting Services Agreement under which SFS USA agreed to perform certain administrative and accounting services.

96.     Lancelot II and SFS USA were parties to an Administrative and Accounting Services Agreement under which SFS USA agreed to perform certain administrative and accounting services.

97.     Under both of the SFS USA Agreements, SFS USA agreed to perform services necessary for the operation and administration of the Onshore Funds.  In particular, SFS USA agreed to calculate the NAV of the Onshore Funds accurately and fairly and in accordance with

GAAP, and to provide financial statements of the Onshore Funds that accurately and fairly reflected the financial condition of SFS USA.

98.     The acts and omissions of SFS USA detailed in paragraphs 1 through 93, above, constitute breaches of the SFS USA Agreements.

99.     SFS USA's breaches of the SFS USA Agreements injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT TWO

### Breach of Contract

(Against SFS Bahamas and SFS USA)

100.     The Trustee restates and realleges paragraphs 1 through 93 as though fully set forth herein.

101.     Lancelot Ltd and SFS Bahamas were parties to an Administrative and Accounting Services Agreement under which SFS Bahamas agreed to perform certain administrative and accounting services.

102.     Under the SFS Bahamas Agreement, SFS Bahamas agreed to perform services necessary for the operation and administration of the Offshore Fund.  In particular, SFS Bahamas agreed to calculate the NAV and NAV per share of the Offshore Fund accurately and fairly, and in accordance with international accounting standards, and to provide financial statements of the Onshore Funds.

103.     SFS Bahamas and SFS USA were parties to a subcontract under which SFS Bahamas delegated to SFS USA its obligations to calculate the NAV and NAV per share of the Offshore Fund.  The Offshore Fund is an intended third-party beneficiary of the subcontract.

104.  The acts and omissions of SFS USA detailed in paragraphs 1 through 93, above, constitute breaches of the SFS Bahamas Agreement and the subcontract between SFS Bahamas and SFS USA.

105.  SFS Bahamas' breaches of the SFS Bahamas Agreement injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

106.  SFS USA's breaches of the SFS Bahamas Agreement and the subcontract between SFS Bahamas and SFS USA injured the Funds in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT THREE

### Negligence

(Against SFS Bahamas and SFS USA)

107.  The Trustee restates and realleges paragraphs 1 through 93 as though fully set forth herein.

108.  SFS Bahamas, as Administrator for the Offshore Fund, was obligated to perform its services with care and skill.

109.  SFS USA, as Administrator for the Onshore Funds, was obligated to perform its services with care and skill.

110.  Defendants had a duty to follow GAAP and international accounting standards in calculating the Funds' NAV and in preparing financial statements.

111.  Defendants breached that duty by failing to undertake any investigation to confirm either the existence of the collateral underlying the Funds' Notes with the Petters Entities, or the existence and operation of the safeguards described in the CIMs.

112.     Defendants further breached that duty by failing to undertake any investigation into whether it was necessary to impair the value of any of the Funds' assets.

113.     Defendants further breached that duty by failing to staff the engagement with competent professionals.

114.     Defendants thus negligently misstated Funds' financial condition in unaudited financial statements and inflated the Funds' monthly Net Asset Value.

115.     As a direct and proximate result of Defendants' breaches of their duties to the Funds, the Funds were damaged in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT FOUR

### Gross Negligence

(Against SFS USA and SFS Bahamas)

116.     The Trustee restates and realleges paragraphs 1 through 93 as though fully set forth herein.

117.     SFS Bahamas, as Administrator for the Offshore Fund, was obligated to perform its services with care and skill.

118.     SFS USA, as Administrator for the Onshore Funds, was obligated to perform its services with care and skill.

119.     Defendants had a duty to follow GAAP and international accounting standards in calculating the Funds' NAV and in preparing financial statements.

120.     Defendants breached that duty by failing to undertake any investigation to confirm either the existence of the collateral underlying the Funds' Notes with the Petters Entities, or the existence and operation of the safeguards described in the CIMs.

121.    Defendants further breached that duty by failing to undertake any investigation into whether it was necessary to impair the value of any of the Funds' assets.

122.    Defendants further breached that duty by failing to staff the engagement with competent professionals.

123.    Defendants thus negligently misstated Funds' financial condition in unaudited financial statements and inflated the Funds' monthly Net Asset Value.

124.    Defendants' breaches of duty constitute gross negligence.

125.    As a direct and proximate result of Defendants' breaches of their duties to the Funds, the Funds were damaged in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT FIVE

### Breach of Fiduciary Duty

(Against SFS Bahamas and SFS USA)

126.    The Trustee restates and realleges paragraphs 1 through 93 as though fully set forth herein.

127.    Defendants agreed to perform the various accounting, administrative, and shareholder services necessary for the successful operation of the Funds.

128.    Defendants enjoyed superior access to information regarding the Funds by virtue of their position as Administrator.  Among other things, four of the employees of SFS Bahamas served as directors of the Offshore Fund during the relevant period, one of whom also served as the Offshore Fund's Loan Acquisition Officer.

129.    The Funds also relied on Defendants' reputation as industry professionals, with the necessary skill, expertise, and knowledge to perform their duties, including the determination the Net Asset Value for the Funds.

130.    By inducing the Funds' trust and confidence, Defendants assumed the role of fiduciaries and owed the Funds a duty to act in good faith and in their best interests.

131.    Defendants breached their fiduciary duties by failing to verify the accuracy of their valuations and by misstating the value of the Funds' assets in calculating the monthly NAV and preparing financial statements.  Defendants failed to investigate the value of the collateral underlying the Notes purchased by the Funds and to investigate the existence, operation, and effectiveness of the Funds' safeguards to manage risk.

132.    Defendants further breached that duty by failing to staff the engagement with competent professionals.

133.    In reliance on Defendants' expertise and representations, the Funds continued to purchase Notes from Thousand Lakes.  These investments were ultimately lost in Petters' Ponzi scheme.

134.    As a direct and proximate result of Defendants' breaches of their duties to the Funds, the Funds were damaged in an amount to be determined at trial, but no less than $1.5 billion, the amount the Funds loaned to Thousand Lakes that has not been repaid.

## COUNT SIX

### Alternatively, Avoidance and Recovery of Preferences
### Pursuant to §§ 547(B) and 550(A) of the Bankruptcy Code

(Against SFS Bahamas and SFS USA)

135.    Count Six is alleged in the alternative to Counts I-V.  The Trustee restates and realleges paragraphs 1 through 93, as though fully set forth herein.

136.    On or within 90 days prior to October 20, 2008, the Debtors transferred to Defendants approximately $135,000.

137.    Each such transfer was made for the benefit of the Defendants.

138.    Each such transfer was made on account of an antecedent debt owing from Debtors to Defendants.

139.    Each such transfer was made while Debtors were insolvent.

140.    Each such transfer enabled Defendants to receive more than they would have received if that transfer had not been made, and if Defendants had received payment of the debt underlying that transfer to the extent provided by the provisions of the Bankruptcy Code.

141.    Pursuant to 11 U.S.C. § 547(b), the Trustee is entitled to avoid each such transfer.

142.    Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover each such transfer, or the value thereof, avoided by this Count.

## COUNT SEVEN

### Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant to §§ 548(A)(1)(B) and 550(A) of the Bankruptcy Code

(Against SFS Bahamas and SFS USA)

143.    The Trustee restates and realleges paragraphs 1 through 93 of this Complaint as though fully set forth herein.

144.    On or within two years prior to October 20, 2008, the Debtors transferred $998,673 to or for the benefit of Defendants.  A schedule of those transfers (the "Transfers") is attached as Exhibit 9.

145.    Each transfer constituted a transfer of an interest of the Debtor in property.

146.    On the date of each transfer, Debtors received less than a reasonably equivalent value in exchange for the transfer.

147.    At the time of each Transfer, Debtors: (a) were insolvent or became insolvent as a result of the Transfer; (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an

unreasonably small capital; or (c) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

148.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to avoid any transfers made to or for the benefit of Swiss Financial during the two years prior to the petition date.

149.     Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover any such transfers, or the value thereof, avoided pursuant to this Count.

## COUNT EIGHT

### Avoidance and Recovery of Fraudulent Transfers Pursuant to 740 ILCS 160/6(a) and 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code

#### (Against SFS Bahamas and SFS USA)

150.     Plaintiff restates and realleges paragraphs 1 through 93 and 143 through 149 of this Complaint as though fully set forth herein.

151.     The Transfers were made, mediately or immediately, to or for the benefit of SFS Bahamas and SFS USA as described in Exhibit 9.

152.     The Transfers were made by the Funds without receiving reasonably equivalent value in exchange.

153.     The Funds were insolvent at the time each of the Transfers was made, or became insolvent as a result of each of the Transfers.

154.     An actual creditor exists who could avoid the Transfers, and obtain further relief, pursuant to section 6(a) and 8(a) of the UFTA.

155.     Such creditor could obtain a judgment against each Defendant for the value of the Transfers received as described in this Complaint, as either (1) the first transferee of the asset or the person for whose benefit the Transfers were made, or (2) a subsequent transferee, pursuant to section 9(b) of the UFTA.

156.     The Trustee may avoid the Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the estate, the Transfers or their value from Defendants as either (1) the initial transferee of the Transfers or the entity for whose benefit the Transfers were made, or (2) the immediate or mediate transferee of such initial transferee pursuant to section 550(a) of the Bankruptcy Code.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant him the following relief against Defendants:

A.     Award damages in an amount to be determined at trial.

B.     Order Defendants to disgorge and return to Debtors all fees, compensation, performance allocations, or any other payments of any kind received directly or indirectly from the Funds since their inception.

C.     Enter judgment in favor of the Trustee and against Defendants avoiding the transfers described in Count VI, VII, and VIII;

D.     Enter judgment in favor of the Trustee and against the Defendant pursuant to 11 U.S.C. § 550(a)(1) in an amount to be determined at trial, post-judgment interest, fees and costs to the extent provided by law;

E.     Award such other relief as the Court deems appropriate and just.

Dated:  December 14, 2009

Ronald R. Peterson
Terri L. Mascherin
Sarah Hardgrove-Koleno
Jason J. Green
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654-3456
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484

*Counsel for Chapter 7 Trustee*

Respectfully submitted,

RONALD R. PETERSON, not
individually but as Chapter 7
Trustee for Lancelot Investors
Fund, L.P., *et al.*

By: /s/ *Ronald R. Peterson*

One of His Attorneys

# EXHIBIT E

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, LAW DIVISION

RONALD R. PETERSON, *not individually* )
*but as chapter 7 Trustee for the bankrupt* )
*estates of Lancelot Investors Fund, L.P.,* )
*Lancelot Investors Fund II, L.P., Lancelot* )
*Investors Fund Ltd., Colossus Capital* )
*Fund, L.P., and Colossus Capital Fund,* )
*Ltd.* )
 )
    Plaintiff, )
 )
  vs. )
 )
MCGLADREY & PULLEN LLP, )
MCGLADREY& PULLEN CAYMAN, )
SIMON LESSER, RSM MCGLADREY, INC. )
and H&R BLOCK, INC. )
 )
    Defendants. )



Case. No.

2009L014920
CALENDAR/ROOM V
TIME 00:00
Other Com Litigation

JURY DEMANDED

### COMPLAINT

  Plaintiff Ronald R. Peterson, not individually but as Chapter 7 Trustee for the Bankrupt

Estates of Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P., Lancelot Investors

Fund, Ltd. (collectively the "Lancelot Funds"), Colossus Capital Fund, L.P., and Colossus

Capital Fund, Ltd. (collectively the "Colossus Funds"), through his attorneys, Edward T. Joyce

& Associates, P.C., states as his Complaint against Defendants McGladrey & Pullen LLP,

McGladrey & Pullen Cayman, Simon Lesser, RSM McGladrey, Inc. and H&R Block, Inc.:

### NATURE OF ACTION

  1.  This is an action against McGladrey & Pullen LLP ("McGladrey"), McGladrey &

Pullen Cayman ("McGladrey Cayman") and Simon Lesser ("Lesser"), a McGladrey partner and

a managing director of RSM McGladrey, Inc. ("RSM"), for negligently auditing the Lancelot

Funds and the Colossus Funds (collectively referred to herein as "the Funds"). RSM is liable for

the negligent acts of its agents, McGladrey and Lesser. H&R Block ("Block") is liable for equitable restitution as described herein.

2. The Lancelot Funds were hedge funds managed by Lancelot Investment Management, LLC ("Lancelot Management") and the Colossus Funds were hedge funds managed by Colossus Capital Management, LCC ("Colossus Management"). Both of these management companies were controlled by Gregory Bell ("Bell").

3. Beginning in 2003, Lancelot Management, acting through Bell, engaged Altschuler Melvoin & Glasser LLP ("Altschuler") to audit the financial statements of the Funds. In November 2006, McGladrey acquired the assets of Altschuler and continued as the Funds' auditor.

4. McGladrey and Lesser had a duty to conduct the Funds' audits in accordance with generally accepted auditing standards to obtain reasonable assurances about whether the Funds' financial statements were free from material misstatements.. As described herein, McGladrey and Lesser breached that duty by negligently planning and performing the audits. As a result, McGladrey improperly provided reasonable assurance to the Funds that their financial statements were free of material misstatements.

5. As a result of McGladrey's breach, the Lancelot Funds continued to invest hundreds of millions of dollars in an investment vehicle indirectly run by Thomas J. Petters ("Petters").

6. In September 2008, it was discovered that Petters was operating a Ponzi scheme through which he was using the Funds' investments for his personal use and for repayment to other investors. Through defendants' negligence, the Funds suffered damages in an amount exceeding $1.5 billion.

## PARTIES

7.     Plaintiff, Ronald R. Peterson ("Peterson" or "Plaintiff ") was appointed by the United States Bankruptcy Court of the Northern District of Illinois as Trustee for the bankrupt estates of the Funds.

8.     McGladrey is an Iowa limited liability partnership with its principal place of business located at 3600 American Boulevard, Bloomington, Minnesota.  McGladrey has an expansive presence in Illinois with 11 offices and more than 1,100 professionals throughout the state.

9.     McGladrey Cayman is a Cayman entity with its principal place of business at 2nd Floor, Harbour Place, Georgetown, Grand Cayman, Cayman Islands.  McGladrey Cayman is an approved local auditor of the Cayman Islands Monetary Authority.

10.     RSM is a Delaware corporation with its corporate headquarters located at 3600 American Boulevard, Bloomington, Minnesota.   RSM has an alternative practice structure with McGladrey whereby both entities work together to provide clients both attest (through McGladrey) and non-attest (through RSM) services.

11.     Block, Inc. is a Missouri corporation with its corporate headquarters located at One H&R Block Way, Kansas City, Missouri.   As a result of the alternative practice structure between McGladrey and RSM, an inordinate percentage of McGladrey's gross revenues are transferred to Block through RSM.  As a result of these transfers, the costs and structural barriers of the administrative service agreement and alternative practice structure made it difficult for McGladrey to manage its practice and to attract and keep talented professional accountants. These problems impacted on McGladrey's ability to service its clients.

12.     Lesser is an Illinois resident.  He is a partner of McGladrey and a managing

3

director/employee of RSM.  Lesser was the partner in charge of the Funds' audits.

## JURISDICTION & VENUE

13.    This Court has subject matter jurisdiction over this action and personal jurisdiction over defendants pursuant to 735 ILCS 5/2-209 because, among other reasons, they: (a) have transacted business within this State; (b) committed negligent acts within this State; (c) performed a contract substantially connected to this State; and/or (d) reside in this State.

14.    Venue is proper in Cook County, Illinois pursuant to 735 ILCS 5/2-101 because a substantial part of the events giving rise to these claims occurred in Cook County.

## FACTS

### THE LANCELOT FUNDS

15.    Bell established the Funds to invest in short-term (i.e., 90 to 180 days) trade finance notes.  Those notes evidenced secured loans made to one or more independently controlled and unrelated special purpose vehicles which engaged in the business of acquiring goods and selling those goods to major retailers.  Thousand Lakes LLC was one such special purpose vehicle.  Petters, CEO and chairman of Petters Group Worldwide, owned a ninety-nine percent interest in Thousand Lakes.

16.    Prior to starting Lancelot Management, Bell worked at Epsilon, a hedge fund that also invested in short-term trade finance notes issued by a company controlled by Petters. Bell met and was impressed by Petters while he was at Epsilon.  Bell left Epsilon to set up the Funds. He had seen Epsilon's success as a result of its investments in Petters-related entities.

### THE INVESTMENT

17.    A typical investment transaction was  to look like this: one of the Funds would loan money to Thousand Lakes LLC ("Thousand Lakes").  Thousand Lakes would then issue a

4

promissory note to the Fund. Thousand Lakes was to use that loan to finance the purchase of goods, such as plasma televisions and other high-end electronics from two suppliers, Enchanted Family Buying Company ("Enchanted") and Nationwide Resources International, Inc. ("Nationwide"). Thousand Lakes would then sell the goods to major retailers, including Costco or its affiliate, National Distributors pursuant to a purchase order which predated the Fund's loan to Thousand Lakes. The Thousand Lakes note was to be secured by the goods, account receivables and credit insurance. The Funds earned revenue from interest payments Thousand Lakes made on the notes. Costco was to wire transfer payment for the goods to a Thousand Lakes bank account which was to be controlled by the Fund.

18. The Funds raised money from "accredited investors." Further to that end, potential investors received a Confidential Information Memorandum ("CIM") which described the Funds' investment strategy. (A copy of a typical CIM is attached hereto as Exhibit 1.) The CIM's for the individual funds were similar in all material respects.

19. The CIM for Lancelot Investors Fund, L.P., for example, provides that the principal objective of the Fund is "to seek consistent and reliable investment returns while minimizing the risk of permanent impairment to capital." (Exh. 1 at p. 5.) The CIM further provides that the General Partner of the Fund (Lancelot Management) "seeks to achieve the Fund's investment objective by investing the Fund's assets in short-term secured trade finance notes ("Notes") by, among other things, acting as the originator of Notes. (Id.)

20. Investors in the Funds were further told through the CIM that:

> It is anticipated that the Notes originated by the Fund will evidence loans made to one or more independently controlled special purpose vehicles ("SPVs") which engage in the business of acquiring goods and selling such goods to major retailer ("Retailers"). Each SPV will use the proceeds from such Notes to finance the acquisition of the goods (the "Underlying Goods"), which such SPV sells to a Retailer. The only

> creditors of an SPV will be the holders of the Notes issues by such SPV.
>
>              ***
>
> It is [further] anticipated that the Notes originated by the Fund will pay a fixed interest rate, and the Fund will earn revenue from the Notes through the collection of such interest payments...

(Id.)

21.      Further, the CIM disclosed that the Fund "will enter Notes only in circumstances where the SPV has a pre-existing, binding agreement with a Retailer to sell the Underlying Goods to such Retailer on a future date (a "Purchase Order"). As a result of such Purchase Orders, the Fund will assume little or no inventory risk with respect to the Underlying Goods." (Exh. 1 at p. 6.)

22.      Significantly, the CIM provided that "[w]ith respect to each Note entered into by the Fund, the Fund will require collateral generally equal to 125% of the value of the Note." (Id.) Further, the Fund "will have a security interest in the Underlying Goods which will be protected through use of a proof of encumbrance filing under Article 9 of the Uniform Commercial Code. In addition to its security interest in the Underlying Goods, each Note entered into by the Fund will be guaranteed by the SPV's principals and/or affiliates of the SPV." (Id.)

23.      Further protections for the Fund described in the CIM include: (a) credit insurance purchased by the SPV with respect to the particular Retailer with the Fund named as the "loss payee" on such insurance policy; and (b) a "lock-box" arrangement with the SPV, pursuant to which the Fund will have control over the SPV's bank account into which the Retailer will pay the purchase price for the Underlying Goods, which is designed to protect the Fund from the SPV using such proceeds for any other purpose prior to satisfying the SPV's obligations under the Note. (Id.) Contrary to what is stated in the CIM, there never were any Underlying Goods,

there never was a Retailer and the Retailer never paid for the Underlying Goods by depositing money into the SPV's lock-box account.

24.     In addition, the CIM described the risks associated with an investment in the Lancelot Funds which include, but are not limited to:

a.  Market Risks – There can be no assurance that what is perceived as an investment opportunity will not, in fact, result in losses as a result of one or more of a wide variety of factors. The Fund can only be successful if the General partner is able to invest successfully, and there can be no assurance that this will be the case;

b.  Limited Investment Focus – The Fund's investment activities will focus almost exclusively on investment in Notes. Given the Fund's relatively narrow investment focus, an investment in the Fund should not be considered a complete investment program for any investor's assets. Prospective investors should view an investment in the Fund as one component of their investment program.

c.  Investments in Notes – The Notes held by the Fund will be subject to various risks, such as credit risk, fraud risk, and liquidity risk.

   i.   Credit risk relates to the ability of the issuer of a security to make interest and principal payments on the security as they become due.

   ii.  Fraud risk relates to a fraud by the issuer of the Note or an adverse event related to the issuer of a Note which can reduce or eliminate the value of such Note.

   iii. Liquidity risk relates to the fact that the Notes are an illiquid investment for which there is no established resale market.

d.  Retailer Risk – The SPV's dealings with Retailers present a variety of material risks to the Fund. For example, the SPV's ability to make principal and interest payments on the Note may depend on the Retailer's payment to the SPV of the purchase price for the Underlying Goods. If a Retailer defaults on its payment obligations to the SPV, such default may cause the SPV to default on its payment obligations under the Note, which may result in material losses to the Fund.

e.  SPV Risks – Initially, all Notes held by the Fund will be issued by a single SPV and, in such event, all Notes held by the Fund will be exposed to

7

credit risk with respect to such SPV.

(Exh. 1 at pp. 7-8.)

## THE AUDITORS

25.     Beginning in 2003, Lancelot Management, through Bell, engaged Altschuler to audit the financial statements of the Funds.

26.     Bell chose Altschuler as the Funds' auditor because several of the Funds' initial investors and the Funds' attorney had recommended Altschuler. Bell further chose Altschuler because Altschuler also audited a hedge fund called Arrowhead, which, similar to the Funds, engaged in short-term trade finance note transactions with Petters and his entities.

27.     Moreover, during Altschuler's presentation to Bell regarding why the Funds should retain Altschuler, the relationship between American Express and Altschuler was highly touted. In 1999, The American Express Company acquired the non-attest assets of Altschuler and they were merged into the Chicago metro office of American Express Tax and Business Services ("TBS"). TBS was prominently displayed at the Altschuler offices.

28.     From 1999 until approximately August 2005, TBS had an alternative practice structure with Altschuler. In that regard, TBS performed non-attest services for its clients, while Altschuler performed attest services for those same clients.

29.     Lesser was the Altschuler partner in charge of the Funds' engagement. Lesser was also a managing director of TBS and a TBS employee. Lesser had also audited Arrowhead, a similar fund to the Lancelot Funds.

30.     On August 1, 2005, RSM purchased the stock of TBS. RSM provides tax and accounting services to its clients. Lesser became a managing director of RSM.

31.     One year later, on or about November 15, 2006, McGladrey purchased

8

Altschuler's assets. In announcing that acquisition, McGladrey stated that Altschuler has "a long reputation of quality, expertise and care and concern for its clients and people that fits perfectly with the culture of [McGladrey]." McGladrey and RSM work together to serve clients' business needs. When considered together, the two companies rank as the fifth largest provider of accounting, tax and business consulting in the United States.

32. Lesser became a partner at McGladrey and continued to be the partner in charge of the Lancelot engagement.

33. McGladrey audited the 2006 and 2007 financial statements of Lancelot Investors Fund, LP, Lancelot Investors Fund II, LP and Colossus Capital Fund, LP (the "Domestic Funds") and issued audit opinions for those funds in March 2007 and March 2008. McGladrey Cayman audited the 2007 financial statements of Colossus Capital Fund Ltd. and Lancelot Investors Fund, Ltd., funds that were located in the Cayman Islands (the "Offshore Funds"), and issued audit opinions for those funds in March 2008. Althschuler Cayman audited the Offshore Funds for 2006.

## THE PONZI SCHEME

34. During September 2008, a federal investigatory task force assembled in the District of Minnesota uncovered a massive Ponzi scheme perpetrated by Petters. Petters and several of his co-conspirators were charged with multiple federal felonies. Several pleaded guilty to some of the charges. At present, the total losses involved in this scheme reportedly exceed $3 billion.

35. The Ponzi scheme was accomplished through the fictitious sale of high-definition flat screen television sets and other expensive electronic consumer products by Petters-related entities such as Thousand Lakes to consumer wholesale clubs, such as Costco. Phony purchase

orders and invoices were prepared and provided to numerous investment funds such as the Lancelot Funds.

36.     Petters, several principals of the Petters' entities, and other co-conspirators and participants, have been criminally charged with federal mail fraud, wire fraud, money laundering, and obstruction of justice. Petters was convicted for 20 counts of wire fraud, mail fraud, money laundering and conspiracy on December 2, 2009.

37.     On October 20, 2008, the Funds filed petitions in the U.S. Bankruptcy Court for the Northern District of Illinois, seeking liquidation under Chapter 7.

38.     Prior to the summer of 2008, Bell believed the Lancelot loans to Thousand Lakes to be legitimate and successful. In fact, prior to January 5, 2008 (the date of the last audit) no interest payments were missed on the Funds' Notes. In December 2008, when interest payments started were being paid later than had been before, Bell required Thousand Lakes to engage Eide Bailly to audit its financial statements for the years ending December 31, 2006 and December 31, 2007. In June 2008, Bell received an unqualified opinion from Eide Bailly.

39.     Bell received a management fee for his services. With respect to the Offshore Funds, Bell had the option of collecting his management fees immediately or deferring his fees and reinvesting them in the funds. Bell opted to defer his management fees for the Offshore Funds resulting in Bell leaving over $125 million in fees in the Offshore Funds.

**THE AUDITORS' NEGLIGENCE**

40.     McGladrey and McGladrey Cayman audited the Funds' financial statements for the years ending 2007 and 2008.

41.     McGladrey conducted each of these audits at Lancelot Management's and Colossus Capital Management's offices in Northbrook, Illinois and at Swiss Financial Services,

10

Inc.'s ("Swiss Financial") offices in Naperville, Illinois. Swiss Financial was the administrator of the Funds and performed all or substantially all of the bookkeeping functions for the Funds.

42.    As part of its audit planning process, McGladrey read the CIMs for the Funds and talked to the Funds' manager to learn how the Funds conducted their business. (See, for eg. Exh. 1.) Relying in part on the CIM, McGladrey prepared Notes to the Financial Statements which described the Funds' investment objectives and strategy as follows:

a.   The [Fund] seeks to provide its partners with consistent and reliable returns while minimizing the risk of impairment to capital by, primarily, purchasing short-term trade finance notes ("Notes") (See, Lancelot Investors Fund, LP Independent Auditors' Report as of January 5, 2007, attached hereto as Exhibit 2 at p. 6); and

b.   The Notes purchased by the [Fund] evidence loans made to one or more independently controlled special purpose vehicles ("SPV"). The Notes are primarily issued by a single SPV, which is based in the United States. The SPV is engaged in the business of acquiring goods and selling such goods to major retailers. The SPV uses the proceeds from such Notes to finance the acquisition of goods, which the SPV sells to the retailer. The Notes pay a fixed interest rate, and the Partnership earns revenue from the Notes through the collection of such interest payments (Id.).

43.    Despite the existence of the Ponzi Scheme outlined above and the fact that Thousand Lakes' loans were not structured as called for the CIM and the Master Loan Agreement (see, Exhibit 3 attached hereto and ¶ 21, supra), in each of McGladrey's audit reports for the Funds, McGladrey and McGladrey Cayman represented to the partners of the Funds that it:

conducted [its] audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that [McGladrey] plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit includes assessing the accounting principles used and significant estimates made by management as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our

opinion.

(See, for example, Exh. 2 at p. 1.)

44. Further, each of the audit reports concluded with McGladrey's statement to the Funds' partners that:

> The financial statements [of the Fund] present fairly, in all material respects, the financial position of [the Fund] as of January 5, [applicable year], the results of its operations, changes in shareholders' capital and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

(See, for example, Exhibit 2 at p.1.)

45. In reality, the financial statements did not fairly, in all material respects, present the financial position of the Funds.

46. McGladrey was negligent in failing to determine that the Thousand Lakes loans were not structured as set forth in the CIM and that as a result, Petters was able to defraud the Funds. As a result of McGladrey's negligence, the Lancelot Funds loaned millions of dollars to Thousand Lakes to purchase non-existent "Underlying Goods" based on forged purchase orders. McGladrey breached its duty to the Funds by failing to follow Generally Accepted Auditing Standards ("GAAS").

## COUNT I

### NEGLIGENCE
### AGAINST MCGLADREY, MCGLADREY CAYMAN AND LESSER

### FAILURE TO MEET GENERALLY ACCEPTED AUDITING STANDARDS

47. Plaintiff hereby realleges and incorporates paragraph 1-46 as paragraph 47 of this Count I against McGladrey, McGladrey Cayman and Lesser (collectively referred to in this Count as the "McGladrey defendants").

48.     When performing an independent audit of its client's financial statements, the McGladrey defendants, which held themselves out to be qualified certified public accountants were required and were reasonably expected to follow the following standards, among others:

    a.  Exercise and maintain professional skepticism and an independent stance (see, AU § 150.02, GAAS Gen. Std. No. 2);

    b.  Exercise due professional care in the performance of the audit and the preparation of the audit report (see, id., GAAS Gen. Std. No. 3);

    c.  Adequately plan the audit and properly supervise any assistants (see, id., GAAS Std. of Field Work No. 1);

    d.  Obtain a sufficient understanding of the entity and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements, whether due to error or fraud, and to design the nature, timing and extent of further audit procedures (see, id., GAAS Std. of Field Work No. 2);

    e.  Obtain sufficient competent evidential matter by inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. This includes, but is not limited to, seeking and obtaining reliable information from independent sources, including third parties (see, id., GAAS Std. of Field Work No. 3);

    f.  Plan, supervise and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud (see, id., GAAS Std. of Field Work No. 2); and

    g.  Exercise the skill and care normally possessed by members of the accounting/auditing profession.

49.     In performing their audits of the Funds, the McGladrey defendants breached their duty to the Funds by violating the above auditing standards.

50.     In that regard, the McGladrey defendants violated the audit standard in ¶ 48(a) above by failing to exercise and maintain professional skepticism and an independent stance during its audit of the Funds. Thus, instead of independently verifying the legitimacy of the Petters/Thousand Lakes transactions, McGladrey accepted, at face value, the representations made regarding the Purchase Orders and other facts underlying the transactions including

13

specifically including that Costco or its affiliate was transferring the money due to for the purchase of merchandise directly into the Thousand Lakes lock box account. In other words, the McGladrey defendants made no attempt to: (a) confirm that Thousand Lakes actually had Purchase Orders for the Underlying Goods from Retailers, (b) confirm that the collateral used to securitize the Notes issued by Thousand Lakes even existed; and (c) determine that the Retailer was wire transferring payment for the Underlying Goods to the Thousand Lakes lock-box account.

51. The McGladrey defendants violated the audit standard in ¶ 48(b) above by failing to exercise due professional care in the performance of the audit and the preparation of the audit report. As explained herein, the Funds' primary investment was in the Notes issued by Thousand Lakes which pledged as collateral either: (a) the merchandise Petters/Thousand Lakes had purportedly purchased with the loans obtained from the Funds; or (b) accounts receivable for the fictitious Purchase Orders between Thousand Lakes and the Retailers. Had McGladrey exercised due professional care in the performance of the audits by simply making some telephone calls to Retailers or warehouse site visits, it would have discovered that (a) the inventory for collateralizing the Funds' loans did not exist, and (b) the Retailers never issued a purchase order.

52. McGladrey also violated the audit standard in ¶ 48(c) above by failing to plan the audit and properly supervise any assistants. In that regard, McGladrey failed to put into place an audit plan that would have uncovered the fictitious Purchase Orders and non-existent inventory/collateral. Neither Lesser nor any of his assistants performed or asked Bell to perform the following tasks: (a) write to the warehouses where the collateral (i.e., the Underlying Goods) was stored to confirm the goods were in the warehouses; or (b) send a letter to the Retailers or to

confirm the existence of "pre-existing binding agreements" or Purchase Orders for the purchase of the Underlying Goods. Had the McGladrey defendants put any of these actions into its audit plan, they would have discovered, for example, that the Retailers had no knowledge of such Purchase Orders.

53.     McGladrey also violated the audit standard in ¶ 48(d) above. In that regard, the McGladrey defendants failed to obtain a sufficient understanding of the Funds' business plan and its transactions with Thousand Lakes and Petters. For example, the Funds had entered into a "lock-box" arrangement with Thousand Lakes, whereby the Funds would have control over Thousand Lakes' bank account into which the Retailer was to pay the purchase price for the Underlying Goods. While the McGladrey defendants knew that the "lock-box" arrangement was designed to protect the Funds from Thousand Lakes using such proceeds for any other purpose prior to satisfying its obligations under the Note, not once did any McGladrey defendant ask Bell any questions about the lock-box arrangement nor did McGladrey look at the wire transfers of funds into the lock-box account which would have evidenced that the Retailers' were not depositing the purchase price into the Thousand Lakes' account, but rather, that Petters & Company was making those deposits.     Had the McGladrey defendants truly understood the lock-box arrangement, they would have been able to accurately assess the risk of material misstatement of the financial statements due to potential for fraud, i.e., the non-existent deposits from the Retailers directly into the lock-box, by designing additional audit procedures to test the effectiveness of the lock-box arrangement.

54.     The McGladrey defendants' violations of the audit standards as described above also form the bases for their violation of the audit standards in ¶¶ 48(c), (d) and (f). Significantly, the McGladrey defendants failed to obtain any evidential matter of the existence of

Purchase Orders, Underlying Goods or legitimate Retailers by inspection, observation, inquiries, confirmations or otherwise.

55.     As described herein, the McGladrey defendants made no inquiries of third parties nor sought information from any independent sources. By not doing so, McGladrey failed to exercise the skill and care normally possessed by members of the accounting/auditing profession.

56.     Moreover, the McGladrey defendants failed to obtain relevant substantiation for the valuation of material investments, such as the Notes all in violation of FAS 107. Had McGladrey performed this straightforward task, it would have discovered that the Notes did not have the value assigned to it by in the Funds' financial statements.

57.     Nevertheless, the McGladrey defendants consistently issued unqualified opinions that the financial statements of the Funds fairly presented their financial condition in "conformity with U.S. generally accepted accounting principles."

58.     As a direct and proximate result of the McGladrey defendants' breach of their duties to the Funds, the Funds loaned lost more than $1.5 billion.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

A.     Damages in an amount to be proven at trial;

B.     For such other relief this Court finds just and equitable.


## COUNT II

### NEGLIGENCE
### AGAINST THE MCGLADREY DEFENDANTS

### FAILURE TO MEET AUDIT STANDARD SAS NO. 99 – THE AUDITOR'S RESPONSIBILITY TO DETECT FRAUD IN A FINANCIAL STATEMENT AUDIT

59.     Plaintiff hereby realleges and incorporates paragraph 1-59 as paragraph 60 of this Count II.

60.     An auditing standard, SAS No. 99, *The Auditor's Responsibility to Detect Fraud in a Financial Statement Audit*, became effective in January 2004. This standard requires that auditors perform significant fraud detection auditing procedures in every audit engagement.

61.     SAS No. 99 defines fraud as an intentional act that results in a material misstatement in financial statements. SAS No. 99 reminds auditors that they need to overcome some natural tendencies and biases and approach the audit with a skeptical attitude and questioning mind.

62.     SAS No. 99 significantly expands the number of information sources for identifying risks of fraud. It provides guidance on obtaining information from (a) management and others within the organization; (b) analytical procedures; (c) consideration of fraud factors; and (d) other sources. While SAS No. 99 obligates an auditor to inquire of management and others in the entity, it does not restrict an auditor to making only those inquiries. Rather, SAS No. 99 encourages an auditor to gather or corroborate a wide variety of information that can help the auditor identify or assess risks of material misstatements due to fraud.

63.     SAS No. 99 requires the auditor to:

      a.     Engage in brainstorming sessions to discuss how and where the entity's financial statements might be susceptible to material misstatement due to fraud;

      b.     Gather information necessary to identify risks of material misstatement due to fraud;

      c.     Use the information gathered to identify risks that may result in a material misstatement;

      d.     Evaluate the entity's programs and controls that address the identified risks of material misstatement; and

      e.     Assess the risks of material misstatement due to fraud throughout the audit and to evaluate at the completion of the audit whether the accumulated results of auditing procedures and other observations affect the assessment.

17

64.     As explained above, the McGladrey defendants fell far short of meeting the requirements of SAS No. 99.  They either failed to comply with each of the SAS No. 99 requirements in ¶ 63 above or were negligent in doing so. For example, none of the McGladrey defendants obtained additional corroborative information from independent sources outside the entity, such as the suppliers, Enchanted and Nationwide or the Retailers, such as Costco.  Had the McGladrey defendants complied with SAS No. 99 in a professionally reasonable manner, it would have uncovered the false Purchase Orders and nonexistent inventory and detected the Petters fraud.

65.     As a direct and proximate result of the McGladrey defendants' breach of their duties to the Funds, the Funds lost over $1 billion.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

A.     Damages in an amount to be proven at trial;

B.     For such other relief this Court finds just and equitable.


## COUNT III

### VICARIOUS LIABILITY FOR MCGLADREY'S NEGLIGENCE AGAINST RSM MCGLADREY, INC.

66.     Plaintiff hereby realleges and incorporates paragraph 1-65 as paragraph 66 of this Count III.

67.     RSM is vicariously liable for McGladrey's negligence because RSM had control over key aspects of the audit operations of McGladrey.  In that regard, RSM:

  a.  supplies McGladrey with auditors

  b.  employs McGladrey partners as managing directors, and

  c.  compensates its managing directors based, in part, on their success in developing

18

business for McGladrey.

    d.  owns McGladrey's office space,

    e.  recruits, trains and provides McGladrey with its nonprofessional staff,

    f.  provides McGladrey with office supplies, furniture, fixtures and equipment,

    g.  provides McGladrey with Information Systems development, management, support, including but not limited to hardware, software, operating systems, network systems and Internet Services,

    h.  provides billing services to McGladrey,

    i.  schedules and pays accounts payable for McGladrey,

    j.  assists in collection of McGladrey's accounts receivable,

    k.  prepares McGladrey's payroll and related tax matters,

    l.  manages McGladrey's records,

    m.  assists McGladrey in compliance with all regulatory requirements as requested by McGladrey,

    n.  assists in the maintenance of the books and records of McGladrey,

    o.  provides annual budgeting assistance,

    p.  provides and maintains McGladrey's system of internal accounting,

    q.  provides insurance policies and risk manager services to McGladrey, and

    r.  settles client disputes regarding McGladrey's bills.

68.    As a result of RSM's control over McGladrey's business and operations, it is vicariously liable for McGladrey's negligence.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

A.    Damages in an amount to be proven at trial;

B.    For such other relief this Court finds just and equitable.

## COUNT IV

### ALTER EGO LIABILITY FOR MCGLADREY'S NEGLIGENCE BY RSM MCGLADREY, INC.

69.    Plaintiff hereby realleges and incorporates paragraph 1-68 as paragraph 69 of this Count IV.

70.    As described in Count III, McGladrey is so organized and controlled by RSM, and its affairs are so conducted by RSM, that observance of the fiction of separate identities would sanction a fraud or promote injustice under the circumstances.

71.    Because McGladrey is the alter ego of RSM, RSM is liable for McGladrey's negligence as described in Counts II and III herein.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

A.    Damages in an amount to be proven at trial;

B.    For such other relief this Court finds just and equitable.

## COUNT V

### EQUITABLE RESTITUTION AGAINST H&R BLOCK, INC.

72.    Plaintiff hereby realleges and incorporates paragraph 1-71 as paragraph 72 of this Count V.

73.    McGladrey was a well financed, successful public accounting firm which was owned and controlled by licensed accounting professionals.

74.    On August 2, 1999, H&R purchased the non-attest (i.e., the non-audit) assets of McGladrey for $240,000,000. On information and belief, those assets had little value. As a

central aspect of the purchase through a wholly owned subsidiary, RSM, set up for that purpose, Block siphoned off a significant percentage of McGladrey's gross income through the imposition of an Administrative Service Agreement which had the effect of placing Block in economic control of McGladrey.

75.   The structure of the relationship between Block, acting through RSM and McGladrey, is a violation of the letter and the spirit of the state statutes which govern the practice of accounting. These state statutes are set up to ensure that public accounting firms are owned and controlled by licensed public accountants, in order to ensure that: (a) information, which is used for guidance in financial transactions for assessing the status or performance of commercial and non-commercial enterprises, is dependable, (b) the public interest is protected by requiring that persons engaged in the practice of public accounting be qualified, and that (c) preparing, auditing or examining financial statements or expressing assurance on such statements is reserved to persons who demonstrate their ability and fitness to observe and apply the standards of the accounting profession.

76.   As a result of the monies Block, through RSM is siphoning off from McGladrey, McGladrey is not able to attract the quality of professional needed to competently perform its function as a licensed firm of public accounts, and to meet the goals in ¶3(a)-(c) above.

77.   Competent audits performed by competent auditors is critical to the survival of financial service firms in this country. Competent audits of Lancelot Funds and the Colossus Funds would have either prevented the Petters Ponzi scheme or nipped it in the bud.

78.   Block is unjustly enriched by the structure it put into place among Block, RSM and McGladrey and is therefore liable to Plaintiff for equitable restitution.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

A.    Damages in an amount to be proven at trial;

B.    For such other relief this Court finds just and equitable.

RONALD R. PETERSON, *not individually but as chapter 7 Trustee for the bankruptcy estates of Lancelot Investors Fund, L.P., Lancelot Investors Fund II, L.P. and Colossus Capital Fund, L.P., Lancelot Investors Fund, Ltd. and Colossus Capital Fund, Ltd.*

By: _____

_____
His attorney.

Edward T. Joyce
Rowena T. Parma
**EDWARD T. JOYCE & ASSOCIATES, P.C.**
11 South LaSalle Street
Suite 1600
Chicago, IL 60603
(312) 641-2600
Attorney I.D. 32513

22

# EXHIBIT F

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**

Ronald R. Peterson, not individually but as Chapter 7 Trustee for the bankrupt estates of Lancelot Investors Fund, LP, Lancelot Investor Funds II, LP, Lancelot Investors Fund II, Ltd., Colossus Capital Fund LP and Colossus Capital Fund, Ltd.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Edward T. Joyce
The Law Offices of Edward T. Joyce & Associates, 135 South LaSalle, #2200, Chicago, IL 60603
(312) 641-2600

**DEFENDANTS**

Winston & Strawn LLP

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

Stephen R. Patton/Michael B. Slade
Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654
(312) 862-2000

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (excl. vet.)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Inj.<br><br>**PERSONAL INJURY**<br>☐ 362 Personal Injury— Med. Malpractice<br>☐ 365 Personal Injury— Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158<br>☒ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Security/Commodity/Exch.<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 ADA—Employment<br>☐ 446 ADA — Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence Habeas Corpus:<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

28 U.S.C. 157 - withdrawal of bankruptcy reference.

**VII. PREVIOUS BANKRUPTCY MATTERS** (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**IX. This case** ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE 04/15/2011

SIGNATURE OF ATTORNEY OF RECORD
/s/ Michael B. Slade