**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RONALD R. PETERSON, as Chapter 7 Trustee** ) <br> **For Lancelot Investors Fund, Ltd. and** ) <br> **Colossus Capital Fund, Ltd.** ) <br> ) <br> **Plaintiff** ) <br> ) <br> **v.** ) <br> ) <br> **WINSTON & STRAWN LLP** ) <br> ) <br> **Defendant.** ) | **Case No. 11 C 02601** <br><br> **Judge Matthew F. Kennelly** |

**AMENDED COMPLAINT**

Ronald R. Peterson, not individually but as Chapter 7 Trustee (the "Trustee") for the bankruptcy estates of Lancelot Investors Fund, Ltd. and Colossus Capital Fund, Ltd., hereby complains against Winston & Strawn LLP ("Winston") as follows:

**NATURE OF CLAIM**

1.     This legal malpractice claim arises from Winston's conflicted representation (in derogation of Illinois Rules of Professional Conduct 1.7 and 1.16), failure to investigate (in derogation of Rules 1.1 and 1.3) and failure to disclose material information to its clients (in derogation of Rules 1.4 and 1.13).

2.     Both counts in this Amended Complaint arise from Winston's conflicted representation of (a) Lancelot Investors Fund, Ltd. and Colossus Capital Fund, Ltd. (the "Off-shore Funds"); (b) Lancelot Investment Management, LLC and Colossus Capital Management, LLC ("the "Bell Investment Management Companies"); and (c) Greg Bell, who owned and controlled the Bell Investment Management Companies.

3.    The lack of separate and independent counsel for the above referenced parties impeded the disclosure of material information to the Off-shore Funds.  Winston's breaches of its duty of care and disclosure were a proximate cause of damage to the Off-shore Funds.  For purposes of this claim, the Trustee stands in the shoes of the Off-shore Funds.

## INTRODUCTION

4.    At all times relevant to this claim, Winston was legal counsel to both the Bell Investment Management Companies and the Off-shore Funds.  The engagement arose through Winston's August 25, 2005 engagement letter (Exh. A), which stated that Winston's clients would be the Bell Investment Management Companies and all privately offered investment funds whose investments were managed by the Bell Investment Management Companies.  Prior to October 2008, the Off-shore Funds were privately offered investment funds whose investments were managed by the Bell Investment Management Companies.

5.    During the time period relevant to this Amended Complaint, Bell (through the Bell Investment Management Companies) was a limited agent of the Off-shore Funds pursuant to a contract which (a) limited his authority to managing the investments made by the Funds, and (b) specifically stated that "the Investment Manager shall be an independent contractor and not an employee or dependent agent of the [Fund]."  Bell had no authority to manage the Off-shore Funds (as opposed to managing the investments made by the Funds).

6.    In its role as counsel for the Off-shore Funds, Winston drafted Confidential Information Memoranda ("CIMs") -- i.e., private placement memoranda -- which the Funds used to solicit investors and keep them informed.  As part of that solicitation and

information effort, the 2006 CIMSs drafted by Winston touted that Winston was counsel to the Off-shore Funds.

7.      From the outset and throughout Winston's representation of the Off-shore Funds, Winston was conflicted because it was also representing the Bell Investment Management Companies (and later, Bell individually), and those clients' interests conflicted with the interests of the Off-shore Funds (as explained herein).

8.      The Off-shore Funds are insolvent, principally because they invested most of their assets in loan participation interests for loans made to entities owned by or affiliated with Thomas J. Petters ("the Petters Entities"), and the Petters Entities were operating a Ponzi scheme that unraveled in September 2008.  The Off-shore Funds were also damaged by Winston's breaches of duty described herein.  The Trustee brings this claim to recover all damages for which Winston's breaches of duty were a proximate cause. The claim has been split into two counts because (1) Winston's breaches of duty covered in Count I were continuous from the inception of the relationship in August 2005 through the termination of the relationship in October 2008, whereas (2) Winston's breaches of duty covered in Count II were only in 2008.

9.      Count I concerns the period from August 2005 through September 2008, during which time Winston knew about two problems regarding the Off-shore Funds' investments--the below described "verification problem" and "payment protection problem"--but failed to either disclose those problems to the Off-shore Funds or address those problems in any way.  Count I also concerns Winston's failure to amend (or advise the Off-shore Funds to amend) the CIMs in order to disclose the verification and payment

protection problems, so investors would be properly informed and would not be able to claim that they were misled by representations/omissions in the CIMs.

10.     Count II concerns the period from approximately December 2007 through May 2008, when Bell raised questions to Winston regarding: (a) how the deferred compensation due to him (through the Bell Investment Management Companies) would be prioritized in the event of the Off-shore Funds' insolvency, (b) his desire to borrow money collateralized by the deferred compensation due to him, and (c) his desire to protect his personal assets by placing them in an off-shore asset protection trust.  Those inquiries to Winston created a circumstance such that a competent, unconflicted law firm exercising due care would have initiated an investigation (or recommended that the Off-shore Funds' initiate an investigation) into what was causing Bell's concerns.  Winston was obligated to determine whether Bell's concerns implicated actual or potential threats to the financial integrity of the Off-shore Funds.   However, rather than pursuing this mandated investigation and taking appropriate action in response to such an investigation, Winston defaulted and compounded that fiduciary default by undertaking yet another conflicted representation--this time of Bell individually.  Winston's conflicted representation of Bell effectively negated Winston's ability to address the material issues raised by Bell's inquiries.  Accordingly, Winston breached its duty of care, Winston's fiduciary duties were compromised and Winston's actions/failures to act violated the mandates of at least Rules 1.1, 1.3, 1.4, 1.7, 1.13 and 1.16 and the Restatement (Third) of the Law Governing Lawyers.

## **GENERAL ALLEGATIONS**

### **The Parties**

11.     On October 20, 2008, the Off-shore Funds (i.e., the Debtors) filed a petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are being jointly administered under the caption *In re Lancelot Investors Fund, L.P., et al.*, case no. 08-28225.  The United States Trustee for the Northern District of Illinois duly appointed Ronald R. Peterson as Trustee under 11 U.S.C. 701(a)(1) of the Bankruptcy Code by orders dated October 20, 2008.  The Trustee brings this Amended Complaint as trustee and not individually.

12.     Lancelot Investors Fund, Ltd. and Colossus Capital Fund, Ltd. (the "Off-shore Funds") are hedge funds incorporated in the Cayman Islands, with their principal places of business in Northbrook, Illinois.  At all relevant times, their business affairs have been directed by boards of directors.  In addition, commencing in February 2006, those Funds have had a Loan Acquisition Officer who, pursuant to an employment agreement prepared by Winston, has been responsible for, inter alia, reviewing and evaluating any proposed loan investment to determine, in his sole discretion, whether such investment is in the best interests of that Fund.  Accordingly, although the Bell Investment Management Companies could recommend particular loan participation investments to the Off-shore Funds, only the Funds' Loan Acquisition Officer could approve such investments.

13.     Defendant Winston & Strawn LLP is a law firm headquartered in Chicago, Illinois.

**Jurisdiction and Venue**

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and (e) because this adversary proceeding is related to *In re Lancelot Investors Fund, L.P., et al.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, jointly administered as Case No. 08-28225.

15.     This adversary proceeding is not a core proceeding, but is otherwise related to a case under Title 11 within the meaning of 28 U.S.C. § 157(c).  Plaintiff consents to the entry of a final judgment.

16.     Venue is proper pursuant to 28 U.S.C. § 1409(a).

**Background**

17.     Between approximately December 2003 and September 2008, the Off-shore Funds invested in loan participation investments which were comprised of interests in loans made by certain "On-shore Funds" to the Petters Entities.  In theory, the loans to the Petter Entities would enable the Entities to purchase consumer electronics to be resold to U.S. retailers.  In theory, the Petters Entities would provide promissory notes made payable to the On-shore Funds -- notes that the Petters Entities would repay with the proceeds from their sales of the electronics to the retailers.  In theory, the Off-shore Funds' loan participation interests would be repaid through the Petters Entities' loan repayments to the On-shore Funds.

18.     In fact, however, the loans in which the Off-shore Funds invested were financing a massive Ponzi scheme which resulted in the loss of billions of dollars.  There were no purchase orders from retailers and there were no goods.  Thus, to the extent that

6

the Petters Entities repaid the loans (with interest) prior to the collapse of the scheme, the Petters Entities did so with investor money.

19. Petters' scheme was uncovered in September 2008 by a federal investigatory task force assembled in the District of Minnesota. As described in the October 2, 2008 Affidavit of an FBI Special Agent (the "FBI Affidavit"):

> The primary method of effectuating the fraud scheme involves PETTERS, his employees, and his associates creating fictitious documents and then providing these documents to current and potential investors as evidence that PCI is buying and selling substantial goods and merchandise which PCI will then resell. In many instances, funds from investors are sent directly to the purported supplier of the merchandise, AIR or ENCHANTED. In turn, AIR or ENCHANTED direct the funds to PCI (less a commission) without any merchandise. PETTERS and other persons then fraudulently pledge the non-existent goods and merchandise as security for the investments.

20. In the federal investigation, FBI agents took the phony purchase orders and invoices directly to Sam's Club and Costco Wholesale to obtain confirmation of their legitimacy, and were immediately informed that they were completely bogus. According to the FBI Affidavit, the Petters Entities knew this could happen and discussed it among themselves: "[I]f investors send auditors out to visit warehouses where the merchandise is located, … the scheme would implode."

21. Until the collapse of the Petters Entities, the Off-shore Funds had no reason to believe that the Petters Entities were operating a Ponzi scheme or that the Funds' "Investment Managers," the Bell Investment Management Companies, were recommending anything other than wholly legitimate investments.

22. Prior to late February 2008, the Bell Investment Management Companies' conduct was at most negligent, and must be viewed in context with Bell's retention of

7

and reliance on legitimate professionals for the Off-shore (and On-shore) Funds: (a) accountants who for years negligently failed to conduct audits which, if done properly, would have discovered Petters' scheme; and (b) attorneys who negligently drafted CIMs which failed to disclose that the investment program had a significant verification problem and a significant payment protection problem (both of which are explained in Count I). Even in late February 2008, Bell did not know that Petters was operating a Ponzi scheme. Instead, Bell knew that the Petters Entitles were late with their loan repayments, and he created in so-called "round trip" transactions to create the appearance of loan repayments in order to protect his self-interests.

23. Any such misconduct by Bell and/or the Bell Investment Management Companies cannot be attributed to the Off-shore Funds, which were Bell's victims. Moreover, Winston entered the scene in August 2005--some 30 months before Bell created the "round trip" transactions. During Winston's entire engagement, Bell did nothing to prevent Winston from fulfilling its duties to the Off-shore Funds.

## COUNT I

### BREACH OF DUTIES OF DUE CARE AND DISCLOSURE OWED TO THE OFF-SHORE FUNDS (AUGUST 2005 THROUGH SEPTEMBER 2008)

24. The Trustee realleges and incorporates by reference paragraphs 1-23 as paragraph 24.

25. From the time Winston began representing the Off-shore Funds, Winston knew (through Bell) that neither the Bell Investment Management Companies, the On-shore Funds nor the Off-shore Funds would be permitted to verify the existence of the electronics that would supposedly collateralize the loans to the Petters Entities--the loans for which the Off-shore Funds were purchasing loan participation interests. Moreover,

Winston knew (through Bell) that no one would be permitted to verify that the retailers appearing as "purchasers" on the purchase orders were in fact purchasing any goods from the Petters Entities. In sum, Winston continuously knew that the Off-shore Funds had a significant verification problem.

26. At the same time Winston was representing the Off-shore Funds, it was also serving as counsel to the Bell Investment Management Companies (which were owned/controlled by Bell). The Bell Investment Management Companies received fees from the Off-shore Funds in the amount of 2% of the stated net asset value of the Off-shore Funds. It was therefore in the interest of the Bell Investment Management Companies to continually attract new investors to the Off-shore Funds and thereby increase their stated net asset values (and Bell's fees), even if the Off-shore Funds were exposed to risks of which they were unaware. The interests of Winston's two sets of clients—the Bell Investment Management Companies on the one hand and the Off-shore Funds on the other--were therefore in conflict and Winston knew of the conflict. Thus, Winston should not have been representing both sets of clients. As explained below, Winston's conflict led to its failure to disclose or address the Off-shore Funds' verification problem.

27. An attorney's duty of due care requires him/her to use such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of tasks which they undertake.

28. Here, pursuant to Winston's above described duty of care and its fiduciary duty of disclosure, Winston needed to disclose the verification problem to the Off-shore Funds and advise those Funds how to address/remedy the problem because:

(a)     the verification problem was material to whether there were, in fact, any purchase orders from the retailers or any goods securing the loans in which the Off-shore Funds were investing;

(b)      although Bell was a member of the Off-shore Funds' boards of directors until February 2006, he was conflicted and could not be counted on to make the disclosure to the other board members; and

(c)     even if Winston could have justifiably relied on Bell to make that disclosure (and it could not), Winston could not have relied on Bell to understand/communicate the significance of the problem and appropriately address/remedy the problem.  In that regard, and as described below, Winston itself negligently failed to treat the verification problem seriously in that it did not even disclose the problem in the amended CIMs that it prepared in early 2006.

Winston breached its duties by neither disclosing nor addressing the verification problem.

29.     As noted above, Winston knew that the 2003 Off-shore CIMs did not disclose the verification problem to potential investors and, therefore, those CIMs needed to be amended to prevent claims of securities fraud against the Funds.  However, although Winston amended the Off-shore CIMs in early 2006, the amended CIMs still did not disclose the verification problem and, indeed, negligently created the false impression that the legitimacy of Petters' investment program had either already been verified or would be verified.  For example, the March 2006 Off-shore CIM stated:

> As indicated above, the Investment Manager anticipates that a portion of the Fund's assets may be invested through the acquisition of Notes (subject to review and acceptance by the Loan Acquisition Officer)….

> It is anticipated that the Notes … will evidence loans made to one or more independently controlled special purpose vehicles (the "SPVs") which engage in the business of acquiring goods and selling such goods to major retailers ("Retailers"). Each SPV will use the proceeds from such Notes to finance the acquisition of goods (the "underlying Goods"), which such SPV sells to a Retailer….
>
> The Fund will purchase Notes only in circumstances where the SPV has a pre-existing, binding agreement with a Retailer to sell the Underlying Goods to such Retailer on a future date (a "Purchase Order"). As a result of such Purchase Orders, the Fund will assume little or no inventory risk with respect to the Underlying Goods….
>
> With respect to each Note purchased by the Fund, the Fund will require collateral generally equal to 120% of the value of the Note. The Fund will have a security interest in the Underlying Goods which will be protected through the use of a proof of encumbrance filing under Article 9 of the Uniform Commercial Code. In addition to its security interest in the Underlying Goods, each Note purchased by the Fund will be guaranteed by the SPV's principals and/or affiliates of the SPV….
>
> The Investment Manager will select Notes to offer to the Fund for purchase based on the terms of the Note, the terms of the Purchase Order, the character of the Underlying Goods, the sufficiency of the collateral, the identity of the Retailer and the availability of credit insurance with respect to the Retailer.

(March 2006 Lancelot Investors Fund, Ltd. CIM, Exhibit B hereto, at pp. 6-7.)

30.     To make matters worse: (a) Winston knew that the Bell Investment Management Companies were (by contract with the Off-shore Funds) supposed to adhere to the above quoted investment policies and restrictions stated in the CIMs; but (b) as evidenced by the verification problem (and the below described payment protection problem), the Bell Investment Management Companies were not adhering to those policies and restrictions; yet (c) Winston did not disclose that problem to the Off-shore

Funds either.  Again, due to Bell's conflicts of interest, Winston could not justifiably rely on Bell to make that disclosure, even when he was on the Off-shore Funds' boards of directors.  Moreover, once Bell resigned from the boards in February 2006, and the Off-shore Funds hired their Loan Acquisition Officer (see para. 12), it was imperative that such Officer be informed about these significant problems.  Nevertheless, Winston failed to do so.

31.     As noted above in para. 30, Winston also knew (through Bell) that the payment protection procedure--i.e. the procedure to ensure that the Off-shore Funds would receive repayment of their share of the money loaned to the Petters Entities--was not being followed by the retailers and the Petters Entities.  In that regard: (a) as described in the 2003 Off-shore CIMs, there was supposed to be a so-called "lock-box" arrangement pursuant to which the Off-shore Funds would have control over a bank account into which the retailers were supposed to pay the Petters Entities, but (b) the retailers and the Petters Entities were not following that arrangement.  Thus, Winston knew that the Off-shore Funds had a significant payment protection problem.  As explained below, Winston's conflict of interest also led to its failure to disclose and address the Off-shore Funds' payment protection problem.

32.     Pursuant to Winston's duties of due care and disclosure, Winston needed to disclose and address the payment protection problem because:

(a)     that problem was material to the risk of participating in Petters' unusual investment program;

12

(b)     although Bell was a member of the Off-shore Funds' boards of directors until February 2006, he was conflicted and could not be counted on to make the disclosure; and

(c)     even if Winston could have justifiably relied on Bell to make the disclosure (and it could not), Winston could not have relied on Bell to understand/communicate the significance of the problem and appropriately address/remedy the problem.   In that regard, and as described below, Winston itself negligently failed to treat the payment protection problem seriously in that it did not even disclose the problem in the amended CIMs that it prepared in early 2006.

Winston breached its duties by neither disclosing nor addressing the payment protection problem.

33.     As noted above, Winston knew that the 2003 Off-shore CIMs did not disclose the payment protection problem to potential investors, and therefore those CIMs needed to be amended to prevent securities fraud claims.   However, although Winston amended the Off-shore CIMs in early 2006, the amended CIMs still did not disclose the payment protection problem and, indeed, continued to negligently misrepresent that the so-called "lock-box" arrangement was in effect:

> [T]he Fund will have a "lock-box" arrangement with the SPV, pursuant to which the Fund will have control over the SPV's bank account into which the Retailer will pay the purchase price for the Underlying Goods, which is designed to protect the Fund from the SPV using such proceeds for any other purpose prior to satisfying the SPV's obligation under the Note.

(March 2006 CIM, Exh. B, at p. 7)

13

34.     If Winston had disclosed the verification and payment protection problems and provided appropriate advice to address those problems, the Off-shore Funds would have conducted an investigation and quickly discovered that they needed to stop lending money to the Petters Entities (and instead needed to invest in "real" investments) because:

(a)     the retailers--whose names appeared on the purchase orders--had not issued any purchase orders;

(b)     there were no electronics or any other goods serving as collateral for the loans to the Petters Entities;

(c)     there was no "lock-box" arrangement; and

(d)     the CIMs that were soliciting new investors were misleading, which exposed the Off-shore Funds to potential fraud claims.

35.     As a proximate result of Winston's breaches of duty, the Off-shore Funds continued to invest in loan participation interests in loans to the Petters Entities (rather than "real" investments), unaware that those loans were secured by non-existent purchase orders and non-existent collateral (and were thus deepening the Off-shore Funds' insolvency).  Thus, when the Petters Ponzi scheme unraveled in the fall of 2008, the Off-shore Funds had no source from which to recover the amounts loaned and they lost millions of dollars that would not have been lost had Winston fulfilled its duties.  As a further proximate result of Winston's breaches of duty, the Off-shore Funds never corrected the misleading CIMs (negligently prepared by Winston), which made the Off-shore Funds the targets of investor fraud claims when the Petters Ponzi scheme unraveled.  Therefore, the Trustee seeks to recover all of the Off-shore Funds' damages

of which Winston's breaches of duty were a proximate cause, the amount of which will be proved at trial.

36.     The Trustee discovered the basis for this portion of his malpractice claim during: (a) the October 2010 deposition of a Winston partner ("Nissen"), who testified that Bell had told him about the verification problem; and (b) the April 2010 interview of Bell, who stated that he had told Nissen about the payment protection problem.  Winston knew of these problems before it amended the Off-shore CIMs in early 2006.

## COUNT II

### BREACH OF DUTIES OF DUE CARE AND DISCLOSURE
### OWED TO THE OFF-SHORE FUNDS (2008)

37.     The Trustee realleges and incorporates paragraphs 1-36 as paragraph 37.

38.     In approximately December 2007, Bell became concerned about the Petters' Entities' defaults (i.e., late repayments or nonpayments) on the loans for which the Off-shore Funds had purchased loan participation interests.  Those defaults caused Bell to become insecure about the Off-shore Funds' ability to pay its liabilities, including the Funds' obligation to pay him (through the Bell Investment Management Companies) $100 million of deferred compensation.  Stated another way, Bell became concerned that (a) the Off-shore Funds could be insolvent and file for bankruptcy, (b) his deferred compensation would be at risk of not being paid (because of bankruptcy rules which prioritize creditors' claims), and (c) if the Off-shore Funds were indeed insolvent, Bell could be facing lawsuits which would put his own on-shore assets at risk.

39.     In the context of Winston's conflicted representation of the Off-shore Funds, Bell began raising questions with Winston about (a) how his deferred compensation would be prioritized among other Off-shore Fund creditors in the event of

the Off-shore Funds' insolvency, (b) how he could protect his personal assets in an off-shore asset protection trust, and (c) how he could borrow money collateralized by his deferred compensation to fund that trust.

40.     An attorney's duty of care requires that he/she use such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of tasks which they undertake.

41.     Here, a competent, diligent, unconflicted law firm in Winston's situation--where its clients were involved in an unusual investment program with known verification an payment protection problems (see Count I)--would have investigated (or recommended that the Loan Acquisition Officer investigate) the reasons for Bell's inquiries and then reported the results of that investigation.  Such an investigation would have quickly uncovered that:

(a)     the Petters Entities were not repaying the loans and could not repay the loans;

(b)     in order to hide that fact, Bell had begun sending new investor money to the Petters Entities so that the Petters Entities could (and did) send money back to the On-shore Funds to create the appearance of loan repayments;[1]

(c)     the "round-trip" transactions needed to be stopped;

(d)     the solicitation of new investor money needed to be stopped;

(e)     efforts to recover money from the Petters Entities needed to be initiated;

(f)     the Investment Manager (the Bell Investment Management Companies) needed to be replaced; and

---

[1]     The FBI has characterized these transactions as "round-trips".

(g)     the Off-shore Funds needed to determine what other measures were necessary to mitigate their losses.

42.     The conflicted Winston firm, however, neither initiated nor recommended such an investigation, and thus took no appropriate action in response to the above listed information that such an investigation would have uncovered.  Instead, Winston defaulted on its fiduciary obligations and compounded that default by undertaking yet another conflicted representation--this time of Bell individually.

43.     By May 2008, Winston was advising Bell on all of his questions (see para. 39).  With respect to Bell's question about prioritization of creditors in the event of the Off-shore Funds' insolvency, Winston advised that Bell obtain an opinion from Cayman Islands counsel specializing in bankruptcy/creditors' rights issues under Cayman Island law.  Winston also helped Bell seek out such an opinion by approaching the Off-shore Funds' Cayman Islands counsel.

44.     In doing so, Winston learned that the Cayman Islands counsel would not provide Bell with an opinion regarding his specific situation because it saw a conflict of interest between Bell and its existing clients, the Off-shore Funds.   After Winston informed that counsel that Bell needed the advice "as soon as possible," that counsel agreed to provide an opinion directed at a set of hypothetical facts.  Still, Winston conducted no investigation and took no appropriate action.

45.     Winston's conflicted representation of Bell effectively negated Winston's ability to address the material issues regarding the Off-shore Funds which were raised by Bell's inquiries.  Accordingly, Winston failed to meet its duty of due care, Winston's fiduciary duties were compromised and Winston's actions/failures to act violated the

mandates of at least Rules 1.1, 1.3, 1.4, 1.7, 1.13 and 1.16 (as those Rules existed in 2008) and the Restatement (Third) of the Law Governing Lawyers.

46.     As a proximate result of Winston's breaches of duty:

(a)     the Off-shore Funds did not know (until on or about October 2, 2008) that the Petters Entities were not repaying the loans and could not repay the loans;

(b)     the Off-shore Funds did not know that Bell had hidden that fact by engaging in "round-trip" transactions with the Petters Entities;

(c)     the "round-trip" transactions with the Petters Entities continued, thereby increasing the Off-shore Funds' losses into the Petters Ponzi scheme;

(d)     the solicitation and collection of new investor money continued, thereby exposing the Off-shore Funds to fraud claims;

(e)     no efforts to recover money from the Petters Entities were initiated;

(f)     the Investment Manager was not replaced; and

(g)     the boards of directors did not take measures to mitigate the Off-shore Funds' losses.

Therefore, the Trustee seeks to recover all of the Off-shore Funds' damages from which Winston's breaches of duty were a proximate cause.

WHEREFORE, the Trustee respectfully requests that judgment be entered for the Trustee in the amount of the damages proximately caused by Winston's breaches of duty described in Counts I and II.

Dated: July 14, 2011

Respectfully submitted,

RONALD R. PETERSON, not individually but as Chapter 7 Trustee for Lancelot Investors Fund, L.P., *et al.*

By:  /s/ Edward T. Joyce
One of his attorneys.

Edward T. Joyce (ARDC # 01371835)
Arthur W. Aufmann (ARDC # 6183448)
Rowena T. Parma (ARDC # 6209690)
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 South LaSalle Street
Suite 2200
Chicago, Illinois  60603
Telephone:  (312) 641-2600
Facsimile:  (312) 641-0360

*Special Counsel for Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused a true and correct copy of the foregoing AMENDED COMPLAINT to be served upon:

Michael Slade
Kirkland & Ellis, LLP
300 N. LaSalle Street
Chicago, Illinois 60654

to be delivered via electronic mail delivery this 14th day of July, 2011.

s/  Arthur W. Aufmann